FILED

2007 Jun-13  PM 02:27
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 1

CM/ECF - U.S. District Court Northern District of Alabama - Docket Report

STAY, TRANSFERRED MDL

# U.S. District Court
## Northern District of Alabama (Western)
## CIVIL DOCKET FOR CASE #: 7:07-cv-00045-HGD

Dunlap v. Pfizer Inc. et al
Assigned to: Magistrate-Judge Harwell G Davis, III
Cause: 28:1441 Petition for Removal- Product Liability

Date Filed: 01/05/2007
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Federal Question

| Date Filed | # | Docket Text |
|---|---|---|
| 01/05/2007 | 1 | NOTICE OF REMOVAL by Pharmacia Corporation, Monsanto Company, G.D. Searle, LLC, Pfizer Inc., from Circuit Court of Tuscaloosa County, Alabama, case number 63-CV-06-900022. ( Filing fee $ 350, receipt number: 200 232639 )filed by Pharmacia Corporation, Monsanto Company, G.D. Searle, LLC, Pfizer Inc. (Attachments: # 1 Notice of Removal part 2)(AHI) (Entered: 01/09/2007) |
| 01/05/2007 | 2 | NOTICE of Certificate of Filing Notice of Removal by Pharmacia Corporation, Monsanto Company, G.D. Searle, LLC, Pfizer Inc. (AHI) (Entered: 01/09/2007) |
| 01/05/2007 | 3 | ANSWER to Complaint by Pharmacia Corporation, Monsanto Company, G.D. Searle, LLC, Pfizer Inc.(AHI) (Entered: 01/09/2007) |
| 01/08/2007 | 4 | NOTICE of Corporate Disclosure by Pharmacia Corporation, Monsanto Company, G.D. Searle, LLC, Pfizer Inc. (AHI) (Entered: 01/09/2007) |
| 01/08/2007 | 5 | MOTION to Stay all proceedings pending transfer to MDL by Pharmacia Corporation, Monsanto Company, G.D. Searle, LLC, Pfizer Inc.. (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C# 4 Exhibit D) (AHI ) (Entered: 01/09/2007) |
| 01/10/2007 | | ORDER granting 5 Motion to Stay. Signed by Judge Harwell G Davis III on 1/10/07. (LBG, ) (Entered: 01/10/2007) |
| 03/02/2007 | 6 | ORDER Transferring Case to MDL: ORDER of Judicial Panel on Multidistrict Litigation transferring this case to the Northern District of California for inclusion in MDL 05-1699; certified copy of docket entries and documents requested by transferee clerk emailed to Clerk of Court in District of Northern Dsitrict of California. (MNH) (Entered: 03/02/2007) |
| 03/02/2007 | 7 | NOTICE of transmittal letter to the Northern District of California. Copies of transfer order, docket sheet and files emailed as requested to be included in MDL. (MNH) (Entered: 03/02/2007) |

### PACER Service Center

### Transaction Receipt

04/11/2007 13:55:29

| PACER Login: | hd0020 | Client Code: | |
| --- | --- | --- | --- |
| Description: | Docket Report | Search Criteria: | 7:07-cv-00045-HGD |
| Billable Pages: | 1 | Cost: | 0.08 |

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

HENRY C. MORRIS,              )
                             )
        Plaintiff,           )
                             )
v.                           )    CASE NO. 2:06-cv-349-MEF
                             )
PFIZER, INC., *et al.*,      )
                             )
        Defendants.          )

## O R D E R

Upon consideration of the plaintiff's Motion to Expedite Ruling on Motion to Remand

(Doc. #16) filed on May 25, 2006, it is hereby

ORDERED that the motion is DENIED.

DONE this 26th day of May, 2006.

                        /s/ Mark E. Fuller
        CHIEF UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

OZZIE JACKSON,　　　　　　　　)
　　　　　　　　　　　　　　　　)
　　　Plaintiff,　　　　　　　　　)
　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　)　　　CASE NO. 2:05-cv-841-F
　　　　　　　　　　　　　　　　)
PFIZER, INC., *et. al.*,　　　　　　)
　　　　　　　　　　　　　　　　)
　　　Defendants.　　　　　　　　)

## ORDER

This cause is before the Court on Defendants' Motion for a Stay of All Proceedings Pending Transfer to Multidistrict Litigation Proceeding (Doc. # 14) filed on September 26, 2005. The Court has considered the arguments in support of and in opposition to this motion. It is hereby ORDERED as follows:

1.　Defendants' Motion for a Stay of All Proceedings Pending Transfer to Multidistrict Litigation Proceeding (Doc. # 14) is GRANTED and this case is STAYED pending a final decision from the Panel on Multidistrict Litigation on transfer of this case to the multi-district litigation proceeding.

2.　A ruling on Plaintiffs' Motion to Remand (Doc. # 8) filed on September 7, 2005, is WITHHELD pending a final decision from the Panel on Multidistrict Litigation on transfer of this case to the multi-district litigation proceeding.

DONE, this 5th day of December, 2005.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

ROSE M. NELSON,                    )
                                   )
        Plaintiff,                 )
                                   )
v.                                 )        Case No.: 2:05-cv-832-F
                                   )
PFIZER, INC., et. al.,             )
                                   )
        Defendants.                )

## ORDER

This cause is before the Court on Defendants' Motion for a Stay of All Proceedings

Pending Transfer to Multidistrict Litigation Proceeding (Doc. # 16) filed on September 26,

2005. The Court has considered the arguments in support of and in opposition to this motion.

It is hereby ORDERED as follows:

1.   Defendants' Motion for a Stay of All Proceedings Pending Transfer to

     Multidistrict Litigation Proceeding (Doc. # 16) is GRANTED and this case is

     STAYED pending a final decision from the Panel on Multidistrict Litigation

     on transfer of this case to the multi-district litigation proceeding.

2.   A ruling on Plaintiffs' Motion to Remand (Doc. # 8) filed on September 7,

     2005 is WITHHELD pending a final decision from the Panel on Multidistrict

     Litigation on transfer of this case to the multi-district litigation proceeding.

DONE this 20th day of October, 2005.

                                   _____/s/ Mark E. Fuller_____
                                   CHIEF UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

KATIE THOMAS,                          )
                                       )
        Plaintiff,                     )
                                       )        CASE NO. 2:05-cv-824-F
v.                                     )
                                       )
PFIZER, INC., *et. al.*,               )
                                       )
        Defendants.                    )

## **ORDER**

This cause is before the Court on Defendants' Motion for a Stay of All Proceedings Pending Transfer to Multidistrict Litigation Proceeding (Doc. # 14) filed on September 26, 2005. The Court has considered the arguments in support of and in opposition to this motion. It is hereby ORDERED as follows:

1. Defendants' Motion for a Stay of All Proceedings Pending Transfer to Multidistrict Litigation Proceeding (Doc. # 14) is GRANTED and this case is STAYED pending a final decision from the Panel on Multidistrict Litigation on transfer of this case to the multi-district litigation proceeding.

2. A ruling on Plaintiffs' Motion to Remand (Doc. # 7) filed on September 7, 2005 is WITHHELD pending a final decision from the Panel on Multidistrict Litigation on transfer of this case to the multi-district litigation proceeding.

DONE this 15th day of November, 2005.

                        /s/ Mark E. Fuller
        _____
        CHIEF UNITED STATES DISTRICT JUDGE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| DONALD L. MCGRADY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 2:06-cv-431-MEF |
| | ) | |
| PFIZER, INC., *et. al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>ORDER</u>

This cause is before the Court on Defendants' Motion for a Stay of All Proceedings

Pending Transfer to Multidistrict Litigation Proceeding (Doc. # 5) filed on May 22, 2006.

The Court has considered the arguments in support of and in opposition to this motion.  It is

hereby ORDERED that the motion is GRANTED and this case is STAYED pending a final

decision from the Panel on Multidistrict Litigation on transfer of this case to the multi-district

litigation proceeding.

DONE this 23rd day of May, 2006.

_____
/s/ Mark E. Fuller
CHIEF UNITED STATES DISTRICT JUDGE

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

WILLIAM RANDOLPH HALL, SR.,    )
As the Administrator of the Estate of    )
WILLIAM RANDOLPH HALL, JR.,    )
            )
     Plaintiff,          )
            )
v.                  )     CASE NO. 2:05-cv-941-F
            )
PFIZER, INC., *et. al.*,     )
            )
     Defendants.     )

## ORDER

This cause is before the Court on Defendants' Motion for a Stay of All Proceedings Pending Transfer to Multidistrict Litigation Proceeding (Doc. # 9) filed on 21 October 2005. The Court has considered the arguments in support of and in opposition to this motion. It is hereby ORDERED as follows:

1.    Defendants' Motion for a Stay of All Proceedings Pending Transfer to Multidistrict Litigation Proceeding (Doc. # 9) is GRANTED. This cause is STAYED pending MDL transfer to *In re Bextra and Celebrex Marketing, Sales Practices and Products Liability Litigation, MDL-1699.*

2.    A ruling on Plaintiffs' Motion to Remand (Doc. # 7) filed on 7 October 2005 is WITHHELD pending a final decision from the Panel on Multidistrict Litigation on transfer of this case to the multi-district litigation proceeding.

3.    Defendant's Motion for Leave to File Reply (Doc. # 12) is DENIED as

MOOT.

DONE this 21ST day of November, 2005.

/s/ Vanzetta Penn McPherson
VANZETTA PENN MCPHERSON
UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

ANN BEVERLY, etc.,                    :

  Plaintiff,                    :

         :

vs.                                   :    CIVIL ACTION 05-0542-M

         :

PFIZER INC., et al.,                  :

         :

  Defendants.                   :

ORDER

The Court heard from counsel this date by telephone on the Notice of Parties' Planning Meeting (Doc. 15) and the status of this action.  It appears that this action will be transferred as a tag-along action to the Northern District of California within the next several days, to become a part of MDL-1699, *In re Bextra and Cellebrex Marketing, Sales, Practices and Products Liability Litigation*.  Therefore, Defendants' Motion for a Stay of All Proceedings Pending Transfer to Multidistrict Litigation Proceeding (Doc. 7) is **GRANTED**.

Plaintiff's Motion for Expedited, Emergency Ruling (Doc. 10) is **MOOT**.  Plaintiff's Emergency Motion to Remand and Motion for Sanctions (Doc. 9), with supporting brief (Doc. 11), and Defendants' Reply Brief (Doc. 13) will be considered if and when this action is remanded to this District.

The fictitious parties set out in the complaint are

hereby **STRICKEN** since fictitious party pleading is not generally recognized under the Federal Rules of Civil Procedure. See e.g., Fed.R.Civ.P. 10(a); 28 U.S.C. § 1441(a); Rommell v. Automobile Racing Club of America, Inc., 964 F.2d 1090, 1098 n.14 (11th Cir. 1992); Weeks v. Benton, 649 F.Supp. 1297, 1298 (S.D. Ala. 1986).

Counsel for the parties are to ensure that all future filings contain the correct and proper names of the corporate Defendants as more fully set out in Defendants' Answer (Doc. 2).

DONE this 17th day of November, 2005.

s/BERT W. MILLING, JR.
UNITED STATES MAGISTRATE JUDGE

2

# Exhibit 2

**FILED**
2006 Jun-01 PM 02:03
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

| | | |
|---|---|---|
| ROGER D. CONNER | ) | |
| | ) | |
| **Plaintiffs** | ) | |
| | ) | |
| **vs.** | ) | CV 06-PT-843-E |
| | ) | |
| G. D. SEARLE, LLC, et al | ) | |
| | ) | |
| **Defendants** | ) | |

### MEMORANDUM OPINION

This cause comes on to be heard on Defendants' Motion for Stay of all Proceedings

Pending Transfer to Multidistrict Litigation Proceeding filed on May 4, 2006 and plaintiff's

Motion to Remand filed on May 5, 2006.

The court starts with a consideration of *Legg v. Wyeth*, 428 F.3d 1317 (11th Cir. 2005).

Contrary to plaintiff's repeated argument that the *Legg* court could not and did not consider the

merits of the remand, that court stated:

> *We may review the merits* of a remand order in considering whether the district
> court abused its discretion by awarding attorneys' fees and costs under 28 U.S.C.
> § 1447(e). (Emphasis added).

The court proceeded to discuss the merits of that case, the facts of which are very similar

to those here.

This court having fully considered the evidence, the briefs, the *Legg* case and the Report

and Recommendation in Dr. Gene N. Gordon v. Pfizer Inc., et al, Civil Action No. 06-RRA-703-

E, concludes that the plaintiff's Motion to Remand should be denied. The defendant's Motion to

Stay will be granted.

This the 1ˢᵗ day of June, 2006.


_____

**ROBERT B. PROPST**
**SENIOR UNITED STATES DISTRICT JUDGE**

# Exhibit 3



ELECTRONICALLY FILED
4/21/2007 11:14 AM
CV-2007-900125.00
CIRCUIT COURT OF
TUSCALOOSA COUNTY, ALABAMA
MAGARIA HAMNER BOBO, CLERK

## IN THE CIRCUIT COURT OF
## TUSCALOOSA COUNTY, ALABAMA

MICHAEL A. ALLEN as the Administrator    *
of the Estate of NINA EARLINE RATLIFF, *
deceased    *
     *
    Plaintiff,    *
     *
vs.    *
     *
PFIZER INC., a Delaware Corporation;    *
PHARMACIA CORPORATION,    *
a Delaware Corporation; MONSANTO    *
COMPANY, a Delaware Corporation;    *
G.D. SEARLE, LLC, a Delaware    *
Corporation; GEORGE A. FIELDS,    *
SHAD FLEEMAN, BRIAN ROBINSON,    *
ROBERT L. VANDELUNE,    *
COLBURN'S NORTHPORT    *
PHARMACY, INC.,    *
And fictitious Defendants    *
A, B, C and D being those persons, firms    *
or corporations whose actions, inactions,    *
fraudulent suppression, fraud, scheme to    *
defraud and/or other wrongful conduct    *
caused or contributed to the Decedent's    *
injuries and damages, and whose true    *
names and identities are presently    *
unknown to the Decedent but will be    *
substituted by amendment when    *
ascertained,    *
     *
    Defendants.    *

CIVIL NO. _____

TRIAL BY JURY IS REQUESTED

## COMPLAINT

COMES NOW, Michael A. Allen, (hereinafter "Plaintiff"), as the Administrator of the

Estate of Nina Earline Ratliff, deceased (hereinafter "Decedent") in an action against Pfizer, Inc.,

Pharmacia Corporation, Monsanto Company, and G.D. Searle, LLC., and George A. Fields,

Shad Fleeman, Brian Robinson, Robert L. Vandelune and Colburn's Northport Pharmacy, Inc.,

(hereinafter "Defendants"), and for Plaintiff's cause of action against the Defendants states as follows:

## Statement Of The Parties

1.   This is a civil action brought by Plaintiff, Michael A. Allen, on behalf of Nina Earline Ratliff deceased for injuries resulting in a Stevens-Johnsons Syndrome (SJS) at death. Decedent was prescribed and used the prescription medication Celebrex (Celecoxib).   This action seeks monetary damages for the wrongful death caused by Celebrex and ingested by Nina Earline Ratliff, the deceased.

2.   Plaintiff, Michael A. Allen, is over the age of 19 years and is the duly appointed Administrator of the Estate of Nina Earline Ratliff.

3.   Decedent, Nina Earline Ratliff, was a resident of Tuscaloosa County when she suffered injuries related to Celebrex, which resulted in her death.

3.   Defendant G. D. Searle LLC (hereinafter "Searle") was a subsidiary of Pharmacia Corporation and is upon information, knowledge and belief an Illinois Corporation.  At all times relevant hereto, Searle, as a subsidiary of Pharmacia Corporation, was in the business of manufacturing, marketing, selling and distributing the pharmaceutical product Celebrex (Celecoxib).  Defendant Searle is licensed and registered to do business in the State of Alabama. Defendant Searle can be served at its principle place of business:  G. D. Searle, LLC; c/o CT Corporation System 208 South LaSalle Street, Suite 814 Chicago, Illinois 60604.

4.   Defendant Pharmacia Corporation (hereinafter "Pharmacia") is a Delaware Corporation with its principal place of business in New Jersey.  At all times relevant to this action, Pharmacia was in the business of manufacturing, marketing, selling and distributing the

2

pharmaceutical product Celebrex (Celecoxib). Defendant Pharmacia is licensed and registered to do business in the State of Alabama. Defendant Pharmacia can be served through the registered agent at: Pharmacia Corporation; The Corporation Company 200 Interstate Park Drive Suite 204 Montgomery, Alabama 36109.

5.     Defendant Monsanto Company (hereinafter "Monsanto") was the parent corporation of Pharmacia and is a Delaware Corporation. At all times relevant hereto, Monsanto, through its subsidiary companies, was in the business of manufacturing, marketing, selling and distributing the pharmaceutical product Celebrex (Celecoxib). Defendant Monsanto is licensed and registered to do business in the State of Alabama. Defendant Monsanto can be served through the registered agent at: Monsanto Company; CSC Lawyers Incorporating SVC Inc. 150 South Perry Street Montgomery, Alabama 36104.

6.     Defendant Pfizer, Inc. (hereinafter "Pfizer") is a Delaware corporation with its principal place of business in New York. At all times relevant hereto, Pfizer was in the business of marketing, selling and distributing the pharmaceutical product Celebrex (Celecoxib). Defendant Pfizer is licensed and registered to do business in the State of Alabama and may be served through its registered agent at Pfizer, Inc., c/o The Corporation Company; 2000 Interstate Park Drive, Suite 204; Montgomery, Alabama 36109.

7.     Defendant George A. Fields at all times material hereto was a sales representative for Defendant G. D. Searle, Pharmacia, Monsanto and Pfizer (hereinafter collectively referred to as "Pfizer") and was acting within the coarse and scope of their employment with the Pfizer Defendant's. Upon information and belief, Defendant Fields is a resident of Alabama and, at all times material hereto, was in the business of marketing selling and distributing Celebrex. Defendant Fields can be served at his home address: 205010 Lowry Drive, Fairhope, Alabama

3

36532. Defendant Fields, for diversity purposes is a citizen of the state of Alabama.

8.     Defendant Shad Fleeman at all times material hereto was a sales representative for the Pfizer Defendants and was acting within the coarse and scope of their employment with the Pfizer Defendant's. Upon information and belief, Defendant Fleeman was a resident of Alabama and, at all times material hereto, was in the business of marketing selling and distributing Celebrex. Defendant Fleeman can be served through the registered agent at Pfizer, Inc., c/o The Corporation Company; 2000 Interstate Park Drive, Suite 204; Montgomery, Alabama 36109.

9.     Defendant Brian Robinson at all times material hereto was a sales representative for Pfizer Defendants and was acting within the coarse and scope of their employment with the Pfizer Defendant's. Upon information and belief, Defendant Robinson is a resident of Alabama and, at all times material hereto, was in the business of marketing selling and distributing Celebrex. Defendant Robinson can be served through the registered agent at Pfizer, Inc., c/o The Corporation Company; 2000 Interstate Park Drive, Suite 204; Montgomery, Alabama 36109. Defendant Robinson, for diversity purposes is a citizen of the state of Alabama.

10.     Defendant Robert L Vandelune at all times material hereto was a sales representative for Pfizer Defendants and was acting within the coarse and scope of their employment with the Pfizer Defendant's. Upon information and belief, Defendant Vandelune is a resident of Alabama and, at all times material hereto, was in the business of marketing selling and distributing Celebrex. Defendant Vandelune can be served at his home address: 1206 Rampart Drive, Dothan, Alabama 36303. Defendant Vandelune, for diversity purposes is a citizen of the state of Alabama.

11.     Defendant Colburn's Northport Pharmacy, Inc. (hereinafter "Northport Pharmacy") is an Alabama corporation with its principal place of business located in Northport,

Alabama. Northport Pharmacy is located in Tuscaloosa County. Northport Pharmacy sold Celebrex to the Decedent in the regular course of its business. Defendant Northport Pharmacy can be served through its principal place of business: 909 McFarland Boulevard North, Northport, AL 35476. Defendant Northport Pharmacy, for diversity purposes, is a citizen of the state of Alabama.

12.    Personal jurisdiction and subject matter jurisdiction are appropriate in this court as to all Defendants, as all Defendants have done business in Tuscaloosa County, Alabama, either directly or by agent, and have thus availed themselves of this jurisdiction.

13.    The Decedent's claims accrued in whole or in part in Tuscaloosa County, Alabama and at the time of Decedent's injury resulting in death. Decedent ingested Celebrex (Celecoxib) in and while residing in Tuscaloosa County, Alabama. Some of these Defendants are foreign corporations, which have been and are currently engaged in business, directly or by authorized agent, in Tuscaloosa County, Alabama. Upon information and belief, George A. Fields, Shad Fleeman, Brian Robinson, and Robert L. Vandelune ("Sales Representative") are individuals who, at all time material hereto, transacted business in Tuscaloosa County, Alabama. Northport Pharmacy, at all times material hereto, transacted business in Tuscaloosa County. Venue and jurisdiction are therefore proper. The claims of Plaintiff herein satisfy the jurisdictional amount of this court.

14.    Pfizer Defendants marketed and distributed this drug in Tuscaloosa County, Alabama. Defendants encouraged the use of this drug in improper customers, misrepresented the safety and effectiveness of this drug and concealed or understated its dangerous side effects in Tuscaloosa County, Alabama. These Defendants aggressively marketed this drug directly to the consuming public through the use of various marketing mediums, including, but not limited to,

5

print and television advertisements in Tuscaloosa County, Alabama.

15.     Based on information and belief, Sales Representatives called on physicians, including Decedent's physician on numerous occasions at which times they presented fraudulent information regarding the safety and efficacy of Celebrex and its harmful side effects, and/or fraudulently suppressed material information regarding the safety and efficacy of Celebrex and its harmful side effects, and/or placed Celebrex in the stream of commerce by providing Decedent's physician(s) samples of the drug Celebrex.

16.     At all times material hereto, the Defendants Sales Representatives advertised, marketed, and/or promoted Celebrex to Decedent's prescribing physician utilizing information known to fraudulently represent the safety and efficacy of Celebrex and the Sales Representatives failed to warn of the known dangers and adverse events associated with the use of the drug Celebrex.

17.     At all times material hereto, the Defendant Sales Representatives placed Celebrex in the stream of commerce by distributing to physicians, including Decedent's physician, numerous samples of Celebrex at varying doses.

18.     Northport Pharmacy is located in Tuscaloosa County from which it conducts its usual and customary business. Northport Pharmacy sold, marketed, and promoted to Decedent Celebrex and thousands of other individuals in the regular and customary course of their business.

19.     At all times relevant hereto, the Defendants actually knew of the defective nature of their product as herein set forth, yet continued to design, manufacture, market, distribute and sell their product in Tuscaloosa County, Alabama. Defendants' conduct exhibits an entire want of care as to the safety of this product and a conscious disregard of the foreseeable harm caused

6

by this product in Tuscaloosa County, Alabama.

## Statement of the Facts

20.     Nina Earline Ratliff used the arthritis medication Celebrex, and suffered a severe adverse reaction and was diagnosed with Stevens-Johnsons Syndrome (SJS) resulting in death.

21.     Defendants sold its product by misleading users about the product and by failing to adequately warn the users of the potential serious dangers which Defendants knew or should have known might result from consuming its product.  Defendants widely and successfully marketed Defendants' Product Celebrex throughout the United States by, among other things, conducting promotional campaigns which misrepresented the efficacy of Defendants' product Celebrex in order to induce widespread use and consumption.  Defendants' product Celebrex was represented to aid the pain and discomfort of arthritis, osteoarthritis and related problems. Defendants made misrepresentations by means of media advertisements, and statements contained in sales literature provided to Decedent's prescribing physician.

22.     As a result of claims made by Defendants regarding the safety and effectiveness of Defendants' product Celebrex, the Decedent suffered a severe adverse skin reaction inducing Stevens-Johnsons Syndrome (SJS).  The Decedent was directed to Northport Medical Center in Northport, Alabama, on April 16, 2005, her symptoms worsened and Decedent was directed by the hospital staff to the emergency room; where she was admitted to the hospital for seven (7) days and treated.  The doctor reports indicate that Decedent suffered a reaction to the drug, and verified that she suffered and died from Stevens-Johnsons Syndrome (SJS), caused by her ingestion of Celebrex. Decedent's injuries have resulted in death.

23.     Had Decedent known the risks and dangers associated with Defendants' product Celebrex, or had Defendants disclosed such information to Decedent, she would not have taken Defendants product Celebrex and would not have suffered her adverse skin reaction and its subsequent complications resulting in death.

24.    As a result of the manufacturing, marketing, and distribution of Celebrex, including Defendant Sales Representatives and Northport Pharmacy, Defendants have reaped huge profits; while concealing from the public, knowledge of the potential hazard associated with the ingestion of Celebrex.

25.    Defendants failed to perform adequate testing in that the adequate testing would have shown that Defendants' product Celebrex possessed serious side effects with respect to which Defendants should have taken appropriate measures to ensure that its defectively designed product would not be placed into the stream of commerce and/or should have provided full and proper warnings accurately and fully reflecting the scope and severity of symptoms of those side effects should have been made.

26.    Prior to the manufacturing, sale and distribution of Defendants' Product Celebrex, Defendants, through its officers, directors and managing agents, had notice and knowledge from several sources, prior to the date of the marketing and sale of Defendants' Product Celebrex to Decedent, that the products presented substantial and unreasonable risks of harm to the consumer. As such, said consumers, including Decedent, were unreasonably subjected to risk of injury or death from the consumption of Defendants' Product Celebrex.

27.    Despite such knowledge, Defendants, including Defendants Sales Representatives and Northport Pharmacy, through its officers, directors and managing agents for the purpose of increasing sales and enhancing its profits, knowingly and deliberately failed to remedy the known defects of Defendants' product Celebrex and failed to warn the public, including Decedent, of the serious risk of injury occasioned by the defects inherent in Defendants' product Celebrex. Defendants and its officers, agents and managers intentionally proceeded with the manufacturing, sale and marketing of Defendants' product Celebrex, knowing that persons would be exposed to serious potential danger, in order to advance their own pecuniary interests. Defendants conduct was wanton and willful, and displayed a conscious disregard for the safety of the public and particularly of Decedent, entitling her to exemplary damages.

8

28.    Defendants acted with conscious and wanton disregard of the health and safety of Decedent, who requests an award of additional damages for the sake of example and for the purpose of punishing such entities for its conduct, in an amount sufficiently large to be an example to others, and to deter Defendants and others from engaging in similar conduct in the future. The above-described wrongful conduct was done with knowledge, authorizations, and ratification of officers, directors, and managing agents of Defendants.

29.    As a result of ingesting the products manufactured, supplies, and/or sold by Defendants, on or about April 23, 2005, Decedent suffered severed, painful and permanent injuries, specifically severe adverse skin reaction and Stevens-Johnson Syndrome (SJS), resulting in death.  As a result of the dangerously defective nature of Defendants' product Celebrex at the time of manufacture and distribution, Decedent, by using Celebrex, sustained injuries and damages as herein alleged.

30.    As a direct and proximate result of Defendants' negligence as described herein, Decedent has sustained harm, including permanent and debilitating injuries resulting in death. These injuries have caused extensive pain and suffering and severe emotional distress, and have substantially reduced Decedent's ability to enjoy life; and have caused Decedent to expend substantial sums of money for medical, hospital, and related care, all to Decedent's general damage. Upon information and belief, Decedent was required to obtain medical and/or hospital care, attention, and services in an amount as yet unascertained.

31.    As a result of the acts and omissions of Defendants, on or about April 23, 2005, Decedent suffered severe, painful and permanent injuries, specifically Stevens-Johnson Syndrome (SJS) resulting in death.

9

A.  **Facts Regarding CELEBREX: Science And Other Cox-2 Inhibitors**

32.     CELEBREX is among a class of pain medications called non-steroidal anti-inflammatory drugs ("NSAIDs"). Aspirin, naproxed (trade name Aleve®), and ibuprofen (trade name Advil®) are examples of well-known NSAIDs.

33.     NSAIDs reduce pain and inflammation by blocking the body's production of pain transmission enzymes called cyclooxygenase, COX-1 and COX-2. COX enzymes trigger the sequential oxidation of various fatty acids to create prostaglandins. Prostaglandins are important cogs in the physiology of pain, igniting hormone-like actions in the immediate vicinity of the cells that release them, thereby inducing inflammation, pain, and fever.

34.     Because COX enzymes and prostaglandins increase the pain associated with tissue injury, the synthesis of prostaglandins by cells of injured tissue becomes a reasonable target for pain-management drugs.

35.     Traditional NSAIDs like aspirin, ibuprofen and naproxen inhibit both COX-1 and COX-2 enzymes simultaneously, providing relief from inflammation and pain, but at the cost of potential adverse gastrointestinal effects, as the prostaglandins that are supported by COX-1 enzymes are involved in the production of gastric mucus which protects the stomach wall from the hydrochloric acid present in the stomach. By blocking the COX-1 enzyme, the body's ability to protect gastric tissue is hampered and, as a result, can cause harmful gastrointestinal side effects, including stomach ulceration and bleeding.

36.     Defendants and other pharmaceutical companies set out to remedy these gastrointestinal side effects suffered by some NSAID users by developing "selective" inhibitors, called coxibs, which targeted only COX-2 production, thus (allegedly) allowing for proper maintenance of gastric tissue while still reducing inflammation. Their development was based on the hypothesis that COX-2 was the source of prostaglandins E2 and J2, which mediate inflammation, and that COX-1 was the source of the same prostaglandins in the stomach lining. By not inhibiting COX-1, whose products provide cytoprotection in the gastric epithelium, these

10

coxibs were thought to decrease the incidence of gastric side effects when compared to traditional NSAIDS that inhibit both COX-1 and COX-2.

37.    In making this decision, however, Defendants and their predecessors in interest either intentionally ignored and/or recklessly disregarded current medical knowledge that selective COX-2 inhibition lowers prostaglandin I2 levels, the predominant COX-2 product responsible for preventing platelet aggregation and clotting, while leaving thromboxane A2, the potent COX-1 platelet aggregator and vasoconstrictor, unaffected.  By selectively inhibiting prostaglandin I2 without similarly suppressing its COX-1 counterpart, CELEBREX and other coxibs expose their users to a host of clot-related cardiovascular risks, including heart attack, stroke, and unstable angina.

38.    On June 29, 1998, SEARLE and PFIZER filed for FDA approval of Celecoxib, its first major COX-2 inhibitor drug, under the trade name CELEBREX.  The FDA granted preliminary approval of the new drug on December 31, 1998 for the relief of signs and symptoms of adult osteoarthritis and rheumatoid arthritis.  A year later, on December 23, 1999, the FDA granted accelerated approval of CELEBREX for a second indication; the reduction of intestinal polyps as an adjunct to endoscopy and surgery in patients with familial adenomatous polyposis (FAP), a rare genetic disorder.

39.    In late January 1999, following FDA approval, PFIZER publicly launched CELEBREX, their new "blockbuster" drug, in one of the largest direct-to-consumer marketing campaigns ever undertaken for prescription drugs.  PFIZER's massive marketing campaign fraudulently and misleadingly depicted CELEBREX as a much safer and more effective pain reliever than less inexpensive traditional NSAIDs.  Defendants and their representatives and agents misrepresented the safety profile of CELEBREX to consumers, the medical community, healthcare providers, and third party payors.

**B.    Facts Regarding Celebrex's Safety And Defendants' Knowledge Thereof**

40.    The potential for cardiovascular risk of selective COX-2 inhibitors was known to Defendants long before the FDA granted market approval in December 1998.  By 1997, and

11

prior to the submission of the New Drug Application (the "NDA") for CELEBREX, Defendants were aware that, by selectively inhibiting only the COX-2 enzyme, CELEBREX altered the homeostatic balance between prostacyclin synthesis and thromboxane and thereby increased the prothrombotic effects of the drugs, causing blood clots to form in those who ingested it. *See* Topol, E.J., *et al.*, *"Risk of Cardiovascular Events Associated with Selective Cox-2 Inhibitors,"* JAMA, August 22, 2001 at 954.

41.     Pharmacologist Dr. Garrett Fitzgerald of the University of Pennsylvania reported in an editorial published in *The New England Journal of Medicine* on October 21, 2004, that contemporaneous with Defendants' launch it was known that selective COX-2 inhibitors, such as CELEBREX, suppressed the formation of prostaglandin I-2 in healthy volunteers, inhibited platelet aggregation in vitro, and may predispose patients to myocardial infarction or thrombotic stroke. Fitzgerald, G.A., Patrono C., *"The Coxibs, Selective Inhibitors of Cyclooxygenase-2,"* N Engl J Med 2001;345:433-442.

42.     Early FDA updates in March and April of 1999 similarly acknowledged this known risk, but noted, based upon PFIZER's representations, that CELEBREX "does not affect platelet aggregation (clumping), an important part of the blood clotting process." *See* FDA Updates, *"New Arthritis Drug May Have Fewer Side Effects,"* FDA Consumer March-April 1999.

43.     Based on the studies performed on CELEBREX, other COX-2 inhibitors, and basic research on this type of selective inhibitor which had been widely conducted, Defendants knew when CELEBREX was being developed and tested that selective COX-2 inhibitors posed serious cardiovascular risks for anyone who took them, and presented a specific additional threat to anyone with existing heart disease or cardiovascular risk factors along with the potential threat of a serious skin reaction.

44.     Despite years of studies on selective COX-2 inhibitors, as well as the disturbing new studies specifically analyzing the risks of CELEBREX, Defendants failed to take any action to protect the health and welfare of patients, opting instead to continue promoting the drug for

sale even after the FDA's Drug Safety and Risk Management Advisory Committee and Arthritis Drug Advisory Committee meetings.

C.    **CELEBREX and Cox-2 Studies Did Not Show CELEBREX to be Safe**

1.    **CELEBREX Long-Term Arthritis Safety Study (CLASS)**

45.    In September 1998, PHARMACIA sponsored an allegedly independent CELEBREX Long-Term Arthritis Safety Study ("CLASS"). The multicenter, double-blind, parallel group study sought to compare the incidence of clinically significant upper gastrointestinal events between CELEBREX 400 mg BID and Ibuprofen 800 mg. (CLASS data is found in NDA 20-998/S-009 submitted to the FDA by SEARLE on June 12, 2000. CLASS was submitted to the FDA on June 12, 2000 and reviewed by James Witter, M.D., Ph.D. (FDA Medical Officer) on September 20, 2000.)

46.    On September 13, 2000, Defendants released the results of the CLASS study in the *Journal of American Medicine*. Silverstein, F.E., *et al.*, *"Gastrointestinal Toxicity with Celecoxib vs. Nonsteroidal Anti-inflammatory Drugs for Osteoarthritis and Rheumatoid Arthritis: The CLASS Study: A Randomized Controlled Trial,"* 284 JAMA 1247 (2000). Researchers enthusiastically reported a "lower incidence of symptomatic ulcers and ulcer complications combined, as well as other clinically supported toxic effects, compared with NSAIDs at standard doses."

47.    Although Defendants touted the CLASS study as the primary evidence to support its theory that CELEBREX was safer for consumers who could not tolerate traditional NSAIDs in their gastrointestinal system, Defendants intentionally, recklessly and/or negligently concealed, suppressed, omitted, and misrepresented the results, risks and defects of the CLASS study. Among other things, Defendants failed to release the study's complete twelve month results releasing only the first six months of trials, reported biased and misleading results, limited conclusions to upper gastrointestinal events despite other known risks factors, and understated known cardiovascular risks.

13

48.    Despite Defendants' favorable CLASS Study conclusions, no other reviewing or administrative body was able to substantiate those findings.  The FDA Medical Officer Review of the CLASS data found CELEBREX to be no more efficacious than other traditional NSAIDS comparators.  *See generally*, FDA Medical Officer Review, NDA 20-998/S-009 submitted to the FDA by SEARLE on June 12, 2000.  According to the FDA's review of the CLASS data: "Celecoxib did not demonstrate any statistical superiority to NSAIDs (pooled) or either comparator (diclofenac and ibuprofen) with regards to the primary safety endpoint of CSUGIE (Clinically Significant Upper Gastrointestinal Adverse Events) at any point in the trial although there were trends that favored celecoxib." (FDA CLASS Review).

49.    The FDA Arthritis Advisory Committee similarly found no "clinically meaningful" safety advantage of CELEBREX over older NSAIDs.  (FDA CDER Arthritis Advisory Committee, February 7th and 8th, 2001, Gaithersburg, Maryland).  The CLASS Study failed to demonstrate a superior safety record over ibuprofen or pooled NSAID data.  Based on this information, the Committee advised that further studies be done to assess the risk of COX-2 drugs and NSAIDS when taken with aspirin.

50.    In a June 2002 editorial, the *British Medical Journal* chastised the Study's "misleading" and "seriously biased" nature; noting that the complete results "clearly contradict[ed] the published conclusions," and warning against the dangers of "overoptimistic," "short-term" data and "post hoc changes to the protocol." Juni, Peter, *et. at., "Are Selective COX 2 Inhibitors Superior To Traditional Non Steroidal Anti-Inflammatory Drugs?"* BMJ 2002;324:1287-1288.  Most noticeably, the CLASS study considered only six months of data despite the fact that researchers at that point had 12 months of data that, when analyzed as a whole, showed no significant difference.  Instead of releasing the complete 12-month results from CLASS, PFIZER relied on and published only the first six months of data.  JAMA 2000, 48:1455-1460.  The results of the completed study revealed the real truth: CELEBREX offered no gastrointestinal (GI) benefit. Almost all ulcer-related complications that had occurred during

14

the second half of the CLASS trials were in users of CELEBEX. These results clearly contradict the published CLASS conclusions.

51.    Editors of the Journal of the American Medical Association (JAMA) and other medical experts were reportedly "flabbergasted" when they realized they had been "duped" by only being provided with the first six months of CLASS data. Okie S., *"Missing data on Celebrex: Full study altered picture of drug,"* Washington Post 2001 Aug 5;Sect A:11.  The *Washington Post* reported JAMA editors noting: "When all of the data were considered, most of CELEBREX's apparent [GI] safety advantage disappeared."

52.    Institutional bias also appeared to play a role in the Study's biased conclusions. According to the *Washington Post*, all sixteen CLASS authors were either employees of PHARMACIA or paid consultants of the company.  Okie, S., *"Missing data on Celebrex: Full study altered picture of drug,"* Washington Post 2001 Aug 5;Sect A:11. Moreover, at least one author, Dr. M. Michael Wolfe, a gastroenterologist from Boston University, admits he was duped by PHARMACIA.  In the summer of 2000, *The Journal of the American Medical Association* asked Wolfe to participate in the "six-month" trial.  Wolfe found the study, tracking 8,000 patients over a six-month period, persuasive, and penned a favorable review, which helped to drive up CELEBREX sales.  It was not until early the next year, while serving on the FDA's Arthritis Advisory Committee, that Wolfe learned the study had run for one year, not six months, as the company had originally led both Wolfe and the *Journal* to believe. *Id.*  Here again, when the complete data was considered, most of CELEBREX advantages disappeared.

53.    Defendants also limited conclusions of the CLASS study to upper gastrointestinal events, despite other known risks factors, and understated known cardiovascular risks.  A metastudy by the Cleveland Clinic published in the Journal of the American Medical Association analyzed data from two major studies, including CLASS, funded by the drug companies and two smaller ones—all for cardiovascular risks. Debabrata Mukherjee, *et al.*, *"Risk of Cardiovascular Events Associated with Selective Cox-2 Inhibitors,"* 286 JAMA 954 (2001).)  The metastudy found that PHARMACIA failed to identify and study cardiovascular risks for their products. The

annualized heart attack rates for patients taking Vioxx or Celebrex, the researchers found, were "significantly higher" than those in a group taking placebos. "The available data raise a cautionary flag about the risk of cardiovascular events with Cox-2 inhibitors," they concluded.

54.     "A total of 36 deaths occurred during the [CLASS] study or during post study follow-up: 19 in the celecoxib group, 9 in the diclofenac group and 8 in the ibuprofen group . . . . Most deaths were cardiovascular in nature." FDA CLASS Review at 54.  The increased number of adverse cardiovascular events in the CELEBREX group was not surprising, as they were also revealed in the original New Drug Application (NDA) submitted for CELEBREX.  "In the original NDA, myocardial infarction was noted to occur at a higher rate in celecoxib-treated as compared to placebo treated patients.  In the long term trial (Trial 024) that was included in the NDA submission, the predominate (>90%) cause of death for patients taking celecoxib at any dose was cardiovascular." FDA CLASS Review at 78.

55.     Public Citizen, a public watchdog organization, also reviewed the CLASS data in its entirety.  A complete review reveals the combined anginal adverse events was 1.4% in the CELEBREX group versus 1.0% in either NSAID group.  Specifically, the rate of heart attack in the CELEBREX was double that of the other two NSAIDs, 0.2% vs. 0.1%, respectively.

56.     Eric Topol of the Clevant Clinic reached a similar conclusion, noting that  the CLASS trail MI rate was 1.6% in CELEBREX group (at a dosage of 400 mg twice a day) and 1.2% in the ibuprofen group for the 1739 patients taking low-dose aspirin.  Topol noted that this numerical excess, albeit not statistically signification, was also found in the 6229 patients not taking aspirin in the trial.  Eric J. Topol, *"Arthritis Medicines and Cardiovascular Events – House of Coxibs,"* JAMA 293:366.  Based on this data, Topol and his colleagues concluded: "It is mandatory to conduct a trial specifically assessing cardiovascular morbidity." *Id.* Unfortunately, no such trials were ever initiated, delaying the official warnings of CELEBREX and jeopardizing countless lives in the process.

57.     The CLASS data proves that PFIZER knew that its first generation COX-2 inhibitor, CELEBREX, caused a disproportionately and statistically significant high number of

adverse cardiovascular events before it was introduced to the market in January 1999. According to Public Citizen, after CLASS, the FDA recommended a trial to specifically assess the cardiovascular risks of COX-2 inhibitors. The Adenoma Prevention with Celecoxib (APC) trial was intended to be this placebo-controlled trial of CELEBREX.

    2.    **APC Trial**

    58.    In early 2000, the National Cancer Institute (NCI), in collaboration with SEARLE and PFIZER, initiated the Adenoma Prevention with Celecoxib (APC) trial, a randomized, double-blind, placebo-controlled study to discover the efficacy of CELEBREX in preventing the growth of pre-cancerous colon polyps. N.ENG. J. MED. 352;11 at 1072. The trial involved 2026 patients across the country with randomization to one of three groups: (1) placebo; (2) 200 mg CELEBREX twice daily; and (3) 400 mg CELEBREX twice daily. The patients, each of whom had an adenomatous polyp removed before enrollment, were followed up for a mean of 33 months while taking the study drug, with the primary objective of limiting the development of colorectal cancer.

    59.    On December 17, 2004, the National Cancer Institute suspended the use of CELEBREX for all participants in the APC trial due to "significant excess of cardiovascular death, myocardial infarction (MI) and stroke." Eric J. Topol, "*Arthritis Medicines and Cardiovascular Events – House of Coxibs,*" JAMA 293:366. Analysis by an independent Data Safety Monitoring Board (DSMB) showed a two to three fold increased risk of major fatal and non-fatal cardiovascular events for participants taking the drug compared to those on a placebo with a secondary dose-response effect.

    60.    The absolute excess of major cardiovascular events of 13/1000 patients at the 800 mg dose (400 mg 2x day) was strikingly similar to the results of trials with rofecoxib and valdecoxib, both selective NSAID COX-2 inhibitors removed for the market for their significant cardiovascular risks. Eric J. Topol, "*Arthritis Medicines and Cardiovascular Events – House of Coxibs,*" JAMA 293:366.

    61.    The FDA reported similar results, noting:

In the National Cancer Institute's Adenoma Prevention with Celecoxib (APC) trial in patients at risk for recurrent colon polyps, a 2-3 fold increased risk of serious adverse CV events was seen for CELEBREX compared to placebo after a mean duration of treatment of 33 months. There appeared to be a dose response relationship, with a hazard ratio of 2.5 for CELEBREX 200 mg twice daily and 3.4 CELEBREX 400 mg twice daily for the composite endpoint of death from CV causes, myocardial infarction (MI), or stroke.

April 7, 2005 FDA Alert: www.fda.gov/cder/drug/infopage/celebrex/celebrex-hcp.htm.

62.    The dosage noted in the study is itself important for two reasons: first, there appears to be an association between dosage and the increase in adverse cardiovascular events; second, most patients increase dosage. PFIZER knew patients were increasing their dosages as noted in the CLASS Study: "Interestingly ... up to 70% of patients increased their dose for celecoxib." FDA CLASS Review at 74. Thus, PFIZER was aware of "dosage creep."

### 3.    Other CELEBREX Trials

63.    Several other CELEBREX trials also gave Defendants insight into the cardiovascular risks and serious skin reaction risks pesented by CELEBREX. The Prevention of Spontaneous Adenomatous Polyps (PreSAP) trial identified the death rate from cardiovascular causes (heart attack, stroke, heart failure, angina, or need for CV procedure) as 3.6% with CELEBREX as compared to 2.7% for placebo.

64.    Public Citizen also reviewed the results of Study IQ IQ5-97-02-001 which reflected "the combined rate of all serious cardiovascular adverse events in patients getting a placebo was 2.1% but was greatly increased in those getting celecoxib to 7.7%, a 3.6 fold increase in CV risk in those people taking celecoxib. (p=0.03)." *Public Citizen*, January 26, 2005, Dr. Sidney M. Wolfe. According to Dr. Sidney Wolfe, "The study revealed a significantly increased rate (3.6-fold) of serious CV adverse events and more than a doubling in the rate of CV deaths in people using celecoxib compared to those using placebo." Id.

**D.    Facts Regarding Defendants' Marketing And Sale Of CELEBREX**

65.    Such an ineffective and unreasonably dangerous drug could only be widely prescribed as a result of a tremendous marketing campaign. In addition to being aggressive, the Defendants' marketing campaign was fraudulent and misleading. But for fraudulent and misleading advertising, consumers, including the Decedent, would not have purchased CELEBREX, a more costly prescriptive drug, ineffective for its intended purposes.

66.    Defendant's marketing was so fraudulent that the FDA issued three Warning Letters to Defendants in October 1999, April 2000, and November 2000, all finding that Defendants were unlawfully making false or misleading statements concerning the safety and/or efficacy of CELEBREX. The November letter cited two direct-to-consumer television advertisements that overstated the efficacy of CELEBREX. The FDA ordered that SEARLE immediately cease distribution of the misleading ads.

67.    On February 2001, the FDA issued a Warning Letter to PHARMACIA stating that promotional activities from marketing CELEBREX were unlawful because they were "false, lacking in fair balance, or otherwise misleading." The FDA found that CELEBREX had been promoted for unapproved uses, in unapproved dosing regiments, and that the marketers had made unsupportable claims that CELEBREX was safer and more effective than other NSAIDs.

68.    In August 2001, it was revealed that PHARMACIA had misrepresented the results of a post-marketing clinical study of CELEBREX when submitting it for publication. PHARMACIA selectively omitted portions of the data relating to adverse effects. The *Washington Post* reported on August 5, 2001 that, "the study had lasted a year, not six months as . . .thought. Almost all of the ulcer complications that occurred during the second have of the study were in CELEBREX users. When all of the data were considered, most of CELEBREX's apparent safety advantage[as compared to traditional NSAIDs] disappeared."

69.    On January 10, 2005 the FDA again issued PFIZER a written reprimand for its promotional activities. The reprimand reads: "These five promotional pieces [3 CELEBREX and 2 Celebrex] variously: omit material facts … and make misleading safety, unsubstantiated

superiority, and unsubstantiated effectiveness claims." Amid continued frustration with PFIZER's continually misleading marketing strategy and ever surmounting evidence of cardiovascular dangers, the FDA Advisory Panel voted overwhelmingly that the company should never again advertise the drug [CELEBREX]."

70.    At all times relevant herein, Defendants engaged in a marketing campaign with the intent that consumers would perceive CELEBREX as a safer and better drug than its other NSAIDs and, therefore, purchase CELEBREX.

71.    Defendants widely and successfully marketed CELEBREX throughout the United States by, among other things, conducting promotional campaigns that misrepresented the efficacy of CELEBREX in order to induce a widespread use and consumption. CELEBREX was represented to aid the pain and discomfort of arthritis, osteoarthritis, and related problems. Defendants made misrepresentations by means of media advertisements, and statements contained in sales literature provided to Plaintiffs' prescribing physicians.

72.    Despite knowledge of the dangers presented by CELEBREX, Defendants and Defendants' predecessors in interest, through their officers, directors and managing agents for the purpose of increasing sales and enhancing its profits, knowingly and deliberately failed to remedy the known defects of CELEBREX and failed to warn the public, including Plaintiffs, of the serious risk of injury occasioned by the defects inherent in CELEBREX. Defendants and their officers, agents and managers intentionally proceeded with the inadequate safety testing, and then the manufacturing, sale and marketing of CELEBREX, knowing that persons would be exposed to serious potential danger, in order to advance their own pecuniary interests. Defendants' conduct was wanton and willful, and displayed a conscious disregard for the safety of the public and particularly of Plaintiffs.

73.    In an elaborate and sophisticated manner, Defendants aggressively marketed CELEBREX directly to consumers and medical professionals (including physicians and leading medical scholars) in order to leverage pressure on third party payors, medical care organizations, and large institutional buyers (e.g., hospitals) to include CELEBREX on their formularies.

Faced with the increased demand for the drug by consumers and health care professionals that resulted from Defendants' successful advertising and marketing blitz, third party payors were compelled to add CELEBREX to their formularies. Defendants' marketing campaign specifically targeted third party payors, physicians, and consumers, and was designed to convince them of both the therapeutic and economic value of CELEBREX.

74.    Defendants represented that CELEBREX was similar to ibuprofen and naproxen but was superior because it lacked any of the common gastrointestinal adverse side effects associated with these and other non-steroidal anti-inflammatory drugs ("NSAIDS"). Defendants promoted CELEBREX as a safe and effective alternative that would not have the same deleterious and painful impact on the gut, but that would be just as effective, if not more so, for pain relief.

75.    Yet, CELEBREX possessed dangerous and concealed or undisclosed side effects, including the increased risk of serious cardiovascular events, such as heart attacks, unstable angina, cardiac clotting, deep vein thrombosis, hypertension, and cerebrovascular events, such as strokes. In addition, CELEBREX, which is significantly more expensive than traditional NSAIDs[1], was actually was no more effective than traditional and less expensive NSAIDs and, just like traditional NSAIDs, carried a risk of perforations, ulcers, and gastrointestinal bleeding. Yet, Defendants chose not to warn about these risks and dangers.

76.    Defendants knew of these risks before the U.S. Food and Drug Administration (the "FDA") approved CELEBREX for sale, but Defendants ignored, downplayed, suppressed, omitted, and concealed these serious safety risks and denied inefficacy in its promotion, advertising, marketing, and sale of CELEBREX. Defendants' omission, suppression, and concealment of this important information enabled CELEBREX to be sold to, and purchased, or paid for by, the Consumers at a grossly inflated price.

---

[1] The cost of Celebrex is at least $3-$6 per day, while an over-the-counter NSAID can cost $.50 or less per day.

77.    Consequently, CELEBREX captured a large market share of anti-inflammatory drugs prescribed for and used by patients.  In 2004 alone, sales of CELEBREX exceeded $2 billion, despite the significantly higher cost of CELEBREX as compared to other pain relievers in the same family of drugs.

78.    Because Defendants engaged in a promotional and marketing campaign that featured an advertising blitz directly targeted to consumers, that touted CELEBREX as a safer drug than other drugs in its class, while uniformly failing to disclose the health risks of CELEBREX, Defendants were able to justify pricing CELEBREX significantly higher than the cost of generic aspirin.  In reality, that price inflation was not justified.  Had Defendants disclosed the truth about CELEBREX, Defendants would not and could not have reaped the billions of dollars in CELEBREX sales that were achieved as a direct result of the concealment, omission, suppression, and obfuscation of the truth.

79.    The Defendants intentionally, deliberately, knowingly, and actively concealed, omitted, suppressed, and obfuscated important and material information regarding the risks, dangers, defects, and disadvantages of CELEBREX from Plaintiffs, the public, the medical community, and the regulators.  This concealment and omission was deliberate, knowing, active, and uniform, was intended to induce and maximize sales and purchases of CELEBREX, and prevented Plaintiffs from obtaining all the material information that would be important to them decision as a reasonable person to purchase, pay for, and/or use CELEBREX.

80.    Defendants' systematic, active, knowing, deliberate, and uniform concealment, omissions, suppression, and conduct caused Plaintiffs to purchase, pay for, and/or use CELEBREX; and caused Plaintiffs' losses and damages as asserted herein.

81.    Had Defendants done adequate testing prior to approval and "market launch," the defendants' scientific data would have revealed significant increases in stroke and myocardial infarction amongst the intended population of CELEBREX consumers.  Adequate testing would have shown that CELEBREX possessed serious side effects.  Defendants should have taken appropriate measures to ensure that their defectively designed product would not be placed in the

22

stream of commerce and/or should have provided full and proper warnings accurately and fully reflecting the scope and severity of symptoms of those side effects should have been made.

82.    In fact, post-market approval data did reveal increased risks of clotting, stroke and myocardial infarction, but Defendants intentionally suppressed this information in order for them to gain significant profits from continued CELEBREX sales.

83.    Defendants' failure to conduct adequate testing and/or additional testing prior to "market launch," and active concealment and failure to warn the medical community and general public of the known cardiovascular risks of CELEBREX was particularly negligent, reckless and/or malicious given the drug's known target market.  Defendants were well aware that most patients taking CELEBREX are elderly and have higher risk of developing cardiovascular risks to begin with.  Nearly half of the patients with arthritis have coexisting cardiovascular disease, and most patients, as discovered in the CLASS study, were prone to higher dosing.

84.    Defendants' failure to conduct adequate testing and/or additional testing prior to "market launch" was based upon their desire to generate maximum financial gains for themselves and to gain a significant market share in the lucrative multi-billion dollar COX-2 inhibitor market.

85.    At the time Defendants manufactured, advertising, and distributed CELEBREX to consumers including Plaintiffs, Defendants intentionally or recklessly ignored and/or withheld information regarding the increased risks of hypertension, stroke and/or myocardial infarctions because Defendants knew that if such increased risks were disclosed, consumers would not purchase CELEBREX, but instead would purchase other cheaper and safer NSAID drugs.

## FIRST CLAIM FOR RELIEF
## STRICT PRODUCT LIABILITY - FAILURE TO WARN

86.    Plaintiff incorporates by reference each and every paragraph of this complaint as though set forth in full in this cause of action.

87.     The Pfizer, Sales Representative, and Northport Pharmacy Defendants manufactured, marketed, distributed, and supplied the Pfizer Defendants' product Celebrex. As such, Defendants had a duty to warn the public including Decedent of the health risks associated with using Defendants' product Celebrex.

88.     Defendants' product Celebrex was under the exclusive control of all Defendants, and was sold without adequate warnings regarding the risk of serious skin reactions, exfoliative dermatitis, toxic epidermal necrolysis, Stevens-Johnson Syndrome and other risks associated with its use.

89.     As a direct and proximate result of the defective condition of all Defendants' product Celebrex, as manufactured and/or supplied by Defendants, and as a direct and proximate result of negligence, gross negligence, willful and wanton misconduct, or other wrongdoing and actions of Defendants described herein, Decedent has suffered, and will continue to suffer injury, harm, and economic loss as alleged herein.

90.     Defendants knew of the defective nature of Defendants' product Celebrex but continued to design, manufacture, market, and sell Defendants' product Celebrex so as to maximize sales and profits at the expense of the public health and safety, in knowing, conscious, and deliberate disregard of the foreseeable harm caused by Defendants' product Celebrex and in violation of their duty to provide an accurate, adequate, and complete warning concerning the use of Defendants' product Celebrex.

91.     Defendants failed to warn the public, Decedent, or her prescribing physicians of the dangerous propensities of Defendants' product Celebrex, which dangers were known or should have been known to Defendants, as they were scientifically readily available.

24

92. Defendants knew and intended that Defendants' product Celebrex would be prescribed by physicians and would be used by persons with a prescription, without any inspection for defects. Defendants also knew that physicians and users such as Decedent would rely upon the representations made by Defendants on the product labels and in other promotional and sales materials upon which the Decedent and her prescribing physician did so rely.

93. As a direct and proximate result of the Defendants' sale of the product Celebrex without adequate warnings regarding the risk serious skin reactions, exfoliative dermatitis, toxic epidermal necrolysis, Stevens-Johnson Syndrome and other risks associated with its use, Decedent has suffered, and will continue to suffer injury and harm as previously alleged herein, including ascertainable economic loss, including the purchase price of Defendants' product Celebrex, out-pocket costs of medical tests and treatment, future medical care and/or services, and other costs incidental to Decedent's ingestion of harmful and defective products, as well as extreme pain and suffering, loss of enjoyment of life, and other damages.

94. Defendants' conduct in the packaging, warning, marketing, advertising, promotion, distribution, and sale of Defendants' Product Celebrex, was committed with knowing, conscious, and deliberate disregard for the rights and safety of consumers such as Decedent, thereby entitling Decedent to punitive damages in an amount to be determined at trial that is appropriate to punish Defendants and deter them from similar conduct in the future.

## SECOND CLAIM FOR RELIEF
## STRICT PRODUCT LIABILITY – DEFECTIVE IN DESIGN OR MANUFACTURE

95. Plaintiff incorporates by reference each and every paragraph of this complaint as though set forth in full in this cause of action.

96.   Defendants were the manufacturers, sellers, distributors, marketers, and/or suppliers of Defendants' product Celebrex, which was defective and unreasonably dangerous to consumers.

97.   Defendants' product Celebrex was sold, distributed, supplied, manufactured, marketed, and/or promoted by Defendants, and was expected to reach and did reach consumers without substantial change in the condition in which it was manufactured and sold by Defendants.

98.   The product Celebrex manufactured, supplied, and/or sold by Defendants was defective in design or formulation in that when it left the hands of the manufacturers and/or sellers and was unreasonably dangerous in that its foreseeable risks exceeded the benefits associated with its design or formulation, the foreseeable risks exceeded the benefits associated with the designs or formulations of the product.

99.   Defendants actually knew of the defective nature of Defendants' product Celebrex but continued to design, manufacture, market, and sell it so as to maximize sales and profits at the expense of the public health and safety, in conscious disregard of the foreseeable harm caused by Defendants' product Celebrex.

100.   There were safer alternative methods and designs for the like product.

101.   At all times material, Celebrex was designed, tested, inspected, manufactured, assembled, developed, labeled, sterilized, licensed, marketed, advertised, promoted, sold, packaged, supplied and/or distributed by Defendants in a defective and unreasonably dangerous condition in ways which include, but are not limited to, one or more of the following:

a.   When placed in the stream of commerce, the drug contained unreasonably dangerous design defects and was not reasonably safe and fit for its

26

intended or reasonably foreseeable purpose or as intended to be used, thereby subjecting users and/or consumers of the drug, including Decedent, to risks which exceeded the benefits of the drug;

b.   The drug was insufficiently tested;

c.   The drug caused harmful side effects that outweighed any potential utility;

d.   The drug was not accompanied by adequate labeling, instructions for use and/or earnings to fully apprise the medical, pharmaceutical and/or scientific communities, and users and/or consumers of the drug, including Decedent, of the potential risks and serious side effects associated with its use, thereby rendering Defendant liable to the Decedent.

e.   In light of the potential and actual risk of harm associated with the drug's use, a reasonable person who had actual knowledge of this potential and actual risk of harm would have concluded that Celebrex should not have been marketed in that condition.

102.   At all times material, the drug Celebrex was designed, tested, inspected, manufactured, assembled, developed, labeled, sterilized, licensed, marketed, advertised, promoted, sold, packaged, supplied and/or distributed, it was expected to reach, and did reach, users and/or consumers of the drug across the United Sates, including Decedent, without substantial change in the defective and unreasonably dangerous condition in which it was sold.

103.   At all times, Decedent used Celebrex for its intended or reasonably foreseeable purpose. As a direct, legal proximate and producing result of the defective and unreasonably dangerous condition of Celebrex, Decedent has sustained harm, including, among other things, acute, permanent and debilitating injuries, for which Decedent is entitled to damages. These

injuries have caused extensive pain and suffering, severe emotional distress, substantially reduced Decedent's ability to enjoy life, and caused Decedent to expend substantial sums of money for medical, hospital and related care.

104.    As a direct, legal, proximate and producing result of the defective and unreasonably dangerous condition of Celebrex, Decedent has been injured in health, strength and activity and has suffered physical injuries as well as mental anguish. All of said injuries caused Decedent intense anxiety, distress, fear, pain and suffering secondary to physical injury and damages, for which Decedent is entitled to damages.

105.    As a direct, legal, proximate and producing result of the defective and unreasonably dangerous condition, Decedent required reasonable and necessary health care treatment and services and incurred expenses for which Decedent is entitled to damages.

106.    As a direct and proximate result of the design and manufacturing defects of Defendants' product Celebrex, Decedent has suffered, and will continue to suffer injury and harm as previously alleged herein, including ascertainable economic loss, including the purchase price of Defendants' product Celebrex, out-pocket costs of medical tests and treatment, future medical care and/or services, and other costs incidental to Decedent's ingestion of harmful and defective products, as well as extreme pain and suffering, loss of enjoyment of life, and other injuries.

107.    Defendants' aforementioned conduct was committed with knowing, conscious, and deliberate disregard for the rights and safety of consumers such as Decedent, including Defendants' knowingly withholding and/or misrepresenting information to the public including Decedent, which information was material and relevant to the harm in question, punitive

damages in an amount to be determined at trial that are appropriate to punish Defendants and deter them from similar conduct in the future.

## THIRD CLAIM FOR RELIEF
## FRAUD

108.    Plaintiff incorporates by reference each and every paragraph of this complaint as though set forth in full in this cause of action.

109.    At all material times, Defendants were engaged in the business of manufacturing, marketing, distributing, promoting, and selling Defendants' product Celebrex.

110.    Defendants made misrepresentations of material facts to, and omitted and/or concealed material facts from, Decedent and her prescribing physician in the advertising, marketing, distribution and sale of Defendants' product Celebrex regarding its safety and use.

111.    Defendants deliberately and intentionally misrepresented to, and omitted and/or concealed material facts from, consumers, including Decedent, and prescribing physicians, that Defendants' product Celebrex was safe when used as intended.   Such misrepresentations, omissions, and concealments of facts include, but are not limited to:

　　　　　　a.    Failing to disclose, and/or intentionally concealing, the results of tests showing the potential risks of serious skin reactions, exfoliative dermatitis, toxic epidermal necrolysis, Stevens-Johnson Syndrome and other injuries associated with the use of Defendants' product Celebrex;

　　　　　　b.    Failing to include adequate warnings with Defendants' product Celebrex about the potential and actual risks and the nature, scope, severity, and duration of serious adverse effects of Defendants' product Celebrex;

　　　　　　c.    Concealing and/or providing false or inaccurate information regarding the known risks of serious skin reactions, exfoliative dermatitis, toxic epidermal necrolysis,

Stevens-Johnson Syndrome and other risks associated with Defendants' product

Celebrex; and

d.     Concealing the known incidents of serious skin reactions, exfoliative

dermatitis, toxic epidermal necrolysis, Stevens-Johnson Syndrome and other injuries, as

previously alleged herein.

112.    Defendants intentionally concealed facts known to them, as alleged herein, in

order to ensure increased sales of Defendants' product Celebrex.

113.    Defendants had a duty to disclose the foregoing risks and failed to do so, despite

possession of information concerning those risks.  Defendants' representations that Defendants'

product Celebrex was safe for its intended purpose were false, as Defendants' Product Celebrex

was, in fact, dangerous to the health of Decedent.   Moreover, Defendants knew that their

statements were false, knew of incidents of serious injuries, such as serious skin reactions,

exfoliative dermatitis, toxic epidermal necrolysis, Stevens-Johnson Syndrome, and knew that

their omissions rendered their statements false or misleading.

114.    Further, Defendants failed to exercise reasonable care in ascertaining the accuracy

of the information regarding the safe use of Defendants' Product Celebrex, and failed to disclose

that Defendants' Product Celebrex caused serious skin reactions, exfoliative dermatitis, toxic

epidermal necrolysis, Stevens-Johnson Syndrome, among other serious adverse effects.

Defendants also failed to exercise reasonable care in communicating the information concerning

Defendants' product Celebrex to Decedent, and/or concealed facts that were known to

Defendants.

115.    Decedent was not aware of the falsity of the foregoing representations, nor was

Decedent aware that material facts concerning the safety of Defendants' product Celebrex had

been concealed or omitted. In reliance upon Defendants' misrepresentations (and the absence of disclosure of the serious health risks), Decedent ingested Defendants' Product Celebrex. Had Decedent known the true facts concerning the risks associated with Defendants' product Celebrex, she would not have taken it.

116.    The reliance by Decedent upon Defendants' misrepresentations was justified because said misrepresentations and omissions were made by individuals and entities that were in a position to know the true facts concerning Defendants' product Celebrex. Decedent was not in a position to know the true facts because Defendants aggressively promoted the use of Defendants' product Celebrex and concealed the risks associated with their use, thereby inducing Decedent and her prescribing physician to use Defendants' product Celebrex.

117.    As a direct and proximate result of Defendants' misrepresentations, and/or concealment, Decedent has suffered, and will continue to suffer injury and harm as previously alleged herein, including extreme pain and suffering, loss of enjoyment of life, ascertainable economic loss, including the purchase price of Defendants' Product Celebrex, out-pocket costs of medical tests and treatment, future medical care and/or services, and other costs incidental to Decedent's ingestion of Defendants' product Celebrex.

118.    Defendants' conduct in concealing material facts and making the foregoing misrepresentations, as alleged herein, was committed with conscious or reckless disregard of the rights and safety of consumers such as Decedent, thereby entitling Decedent to punitive damages in an amount to be determined at trial that is appropriate to punish Defendants and deter them from similar conduct in the future.

## FOURTH CLAIM FOR RELIEF
### Breach of Implied Warranty

119.    Plaintiff incorporates by reference each and every paragraph of this complaint as though set forth in full in this cause of action.

120.    Defendants manufactured, marketed, sold, and distributed Defendants' product Celebrex.

121.    At the time Defendants marketed, sold, and distributed Defendants' product Celebrex for use by Decedent, Defendants knew of the purpose for which Defendants' product Celebrex was intended and impliedly warranted Defendants' product Celebrex to be of merchantable quality and safe and fit for such use.

122.    Decedent and her prescribing physician reasonably relied on the skill, superior knowledge, and judgment of Defendants as to whether Defendants' product Celebrex was of merchantable quality and safe and fit for its intended use.

123.    Decedent used Defendants' product Celebrex which was provided to Decedent's prescribing physician by the Defendants.    Due to Defendants' wrongful conduct as alleged herein, Decedent could not have known about the risks and side effects associated with Defendants' product Celebrex until after Decedent ingested it.

124.    Contrary to such implied warranty, Defendants' product Celebrex was not of merchantable quality and was not safe or fit for its intended use.

125.    As a direct and proximate result of Defendants' breach of implied warranty, Decedent has suffered, and will continue to suffer injury and harm as previously alleged herein, including extreme pain and suffering, loss of enjoyment of life, ascertainable economic loss, including the purchase price of Defendants' product Celebrex, out-pocket costs of medical tests

32

and treatment, future medical care and/or services, and other costs incidental to Decedent's ingestion of harmful and defective products.

126.   Defendants' aforementioned conduct was committed with knowing, conscious, and deliberate disregard for the rights and safety of consumers such as Decedent, thereby entitling Decedent to punitive damages in an amount to be determined at trial that is appropriate to punish Defendants and deter them from similar conduct in the future.

## FIFTH CLAIM FOR RELIEF
### Breach of Express Warranty

127.   Plaintiff repeats and incorporates herein by reference the allegations made in the above Paragraphs.

128.   Defendant expressly warranted that Celebrex was safe and well accepted by patients and was safe for use.

129.   Celebrex does not conform to these express representations because Celebrex is not safe and has high levels of serious, life-threatening side effects.

130.   As a direct and proximate result of the breach of said warranties, Decedent has been damaged, and is therefore entitled to damages as described herein

## SIXTH CLAIM FOR RELIEF
### Negligence

131.   Plaintiff incorporates by reference each and every paragraph of this complaint as though set forth in full in this cause of action.

132.   Defendants owed a duty to consumers of Defendants' product Celebrex, including Decedent, to use reasonable care in designing, testing, labeling, manufacturing, marketing, supplying, distribution and selling Defendants' product Celebrex, including a duty to ensure that

33

Defendants' Product Celebrex did not cause users to suffer from unreasonable, unknown, and/or dangerous side effects.

133.     Defendants failed to exercise reasonable care in the warning about, designing, testing, labeling, manufacture, marketing, sale, and/or distribution of Defendants' product Celebrex and breached its duties to Decedent in that, and not by way of limitation, they did not warn of the known risks associated with the use of Defendants' product Celebrex and did not exercise an acceptable standard of care, i.e., what a reasonably prudent manufacturer or seller would have known and warned about. Moreover, the product lacked sufficient warnings of the hazards and dangers to users of said product, and failed to provide safeguards to prevent the injuries sustained by Decedent. Defendants failed to properly test Defendants' product Celebrex prior to its sale, and as a result subjected users to an unreasonable risk of injury when those products was used as directed and recommended.

134.     Defendants additionally breached its duty and was negligent in its actions, misrepresentations, and omissions toward Decedent, in part, in the following ways:

    a.     Failed to exercise due care in designing, developing, and manufacturing Defendants' Product Celebrex so as to avoid the aforementioned risks to individuals using these products;

    b.     Failed to include adequate warnings with Defendants' product Celebrex that would alert Decedent and other consumers to its potential risks and serious side effects;

    c.     Failed to adequately and properly test Defendants' product Celebrex before placing it on the market;

    d.     Failed to conduct sufficient testing on Defendants' product Celebrex,

34

which if properly performed, would have shown that Defendants' Product Celebrex had serious side effects, including, but not limited to, exfoliative dermatitis, toxic epidermal necrolysis, Stevens-Johnson Syndrome and other serious skin reactions;

e.    Failed to adequately warn Decedent that use of Defendants' product Celebrex carried a risk of serious skin reactions; exfoliative dermatitis, toxic epidermal necrolysis, Stevens-Johnson Syndrome and other serious side effects;

f.    Failed to provide adequate post-marketing warnings or instructions after Defendants knew, or should have known, of the significant risks of reactions from the use of Defendants' product Celebrex;

g.    Placed an unsafe product into the stream of commerce; and

h.    Was otherwise careless or negligent.

135.   Defendants knew, or should have known, that Defendants' product Celebrex caused unreasonably dangerous risks and serious side effects of which Decedent would not be aware.   Defendants nevertheless advertised, marketed, sold and/or distributed Defendants' product Celebrex knowing of its unreasonable risks of injury.

136.   Defendants knew or should have known that consumers such as Decedent would suffer injury as a result of Defendants' failure to exercise reasonable care as described above.

137.   Upon information and belief, Defendants knew or should have known of the defective nature of Defendants' product Celebrex, as set forth herein, but continued to design, manufacture, market, and sell Defendants' product Celebrex so as to maximize sales and profits at the expense of the health and safety of the public, including Decedent, in conscious and/or negligent disregard of the foreseeable harm caused by Defendants' product Celebrex.

138. Defendants failed to disclose to the Decedent and the general public facts known or available to them, as alleged herein, in order to ensure continued and increased sales of Defendants' product Celebrex. This failure to disclose deprived Decedent of the information necessary for her to weigh the true risks of taking Defendants' product Celebrex against the benefits.

139. As a direct and proximate result of Decedent's use of Defendants' product Celebrex, Decedent suffered serious bodily injury including, but not limited to, Stevens-Johnson Syndrome, a severe adverse reaction, and skin disorder.

140. By virtue of Defendants' negligence, Defendants has directly, foreseeably and proximately caused Decedent to suffer serious bodily injury. As a result, the imposition of punitive damages against Defendants is warranted.

141. As a direct and proximate result of Defendants' negligence, Decedent has suffered, and will continue to suffer injury and harm as previously alleged herein, including severe pain and suffering, loss of enjoyment of life, ascertainable economic loss, including the purchase price of Defendants' product Celebrex, out-pocket costs of medical tests and treatment, future medical care and/or services, and other costs incidental to Decedent's ingestion of harmful and defective products.

### SEVENTH CLAIM FOR RELIEF
### Gross Negligence

142. Plaintiff incorporates by reference each and every paragraph of this complaint as though set forth in full in this cause of action.

143. Defendants had a duty to exercise reasonable care in the warning about, design, testing, manufacture, marketing, labeling, sale, and/or distribution of its Defendants' product

Celebrex, including a duty to ensure that Defendants' product Celebrex did not cause users to suffer from unreasonable and dangerous side effects.

144.   Defendants failed to exercise reasonable care in the warning about, design, testing, manufacture, marketing, labeling, sale, and/or distribution of Defendants' Product Celebrex, in that Defendants knew or should have known that taking Defendants' Product Celebrex caused unreasonable and life-threatening injuries, as alleged herein.

145.   Defendants was grossly negligent in the warning about, design, testing, manufacture, marketing, labeling, sale, and/or distribution of Defendants' product Celebrex in that they:

    a.   failed to provide adequate warnings with Defendants' Product Celebrex regarding their possible risks and adverse effects as well as the comparative severity and duration of such adverse effects;

    b.   failed to exercise due care in designing, developing, and manufacturing Defendants' product Celebrex so as to avoid the aforementioned risks to individuals;

    c.   placed unsafe product into the stream of commerce; and

    d.   was otherwise grossly negligent.

146.   Although Defendants knew, or recklessly disregarded, the fact that Defendants' product Celebrex caused potentially lethal side effects, Defendants continued to market Defendants' product Celebrex to consumers, including Decedent, without disclosing these side effects.

147.   Defendants knew and/or consciously or recklessly disregarded the fact that consumers such as Decedent would suffer injury as a result of Defendants' failure to exercise reasonable care as described above.

148.    Defendants knew of, or recklessly disregarded the defective nature of Defendants' product Celebrex, as set forth herein, but continued to design, manufacture, market, and sell Defendants' Product Celebrex so as to maximize sales and profits at the expense of the health and safety of the public, including Decedent, in conscious and/or reckless disregard of the foreseeable harm caused by Defendants' product Celebrex.

149.    As a direct and proximate result of the gross negligence, willful and wanton misconduct, or other wrongdoing and actions of Defendants described herein, which constitute a deliberate act or omission with knowledge of a high degree probability of harm and reckless indifference to the consequences, Decedent has suffered, and will continue to suffer injury and harm as previously alleged herein, including ascertainable economic loss, including the purchase price of Defendants' product Celebrex, out-of-pocket costs of medical tests and treatment, future medical care and/or services, and other costs incidental to Decedent's ingestion of Defendants' harmful and defective product Celebrex. In addition, Decedent has been rendered sick, sore, lame, and disabled, both internally and externally. All of said injuries have caused and continue to cause Decedent intense anxiety, distress, fear, pain, suffering, and distress secondary to the physical injury and damages. In addition, Decedent has suffered other injuries; the exact nature and extent are not known at this time.

150.    As a direct and proximate result of the gross negligence, willful and wanton misconduct, or other wrongdoing and actions of Defendants, which constitute a deliberate act or omission with knowledge of a high degree probability of harm and reckless indifference to the consequences, Decedent will in the future be required to obtain medical and/or hospital care, attention, and services. As a result, Decedent may incur expenses for such health care treatment in an amount as yet unascertained.

38

151.    Defendants' aforementioned conduct was committed with knowing, conscious, and/or deliberate disregard for the rights and safety of consumers such as Decedent, thereby entitling Decedent to punitive damages in an amount appropriate to punish Defendants and deter them from similar conduct in the future.  Defendants continued to promote the efficacy and safety of Defendants' product Celebrex, while providing little or no warnings, and downplayed any risks, even after Defendants knew of the risks and injuries associated with their use.

## EIGHTH CLAIM OF ACTION
### Wrongful Death

152.    Plaintiff repeats and re-alleges each of the allegations contained in this Complaint.

153.    Plaintiff brings this wrongful death count pursuant to Alabama Statute.

154.    As a direct and proximate result of the conduct of Defendants and/or the defective nature of the product as outlined above, Plaintiff's decedent, Nina Earline Ratliff, suffered bodily injury and resulting pain and anguish, loss of capacity of the enjoyment of life, shortened life expectancy, expenses of hospitalization, medical nursing care and treatment, loss of earnings, loss of ability to earn money and eventually, death.

155.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff has incurred hospital, nursing, and medical expenses.  Plaintiff has incurred hospital, nursing, medical, funeral and estate administration expenses as a result of his decedent's death.  Plaintiff brings this claim on behalf of his decedent's lawful beneficiaries for these damages and for all pecuniary losses sustained by said beneficiaries.

156.    By reason of the foregoing Plaintiff, on behalf of his decedent, Nina Earline Ratliff, demands judgment against Defendants for damages, both compensatory and punitive, interest, attorneys' fees, costs of suit as provided by law, and such other relief as the Court may deem just and equitable.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for entry of Judgment against Defendants and award relief in an amount in excess of seventy-five thousand dollars ($75,000.00) as follows:

1.   Compensatory damages in an amount supported by the evidence at trial;

2.   Past medical care according to proof;

3.   Past and future loss of income and earning to proof;

4.   Past and future pain and suffering according to proof;

5.   Funeral expenses;

6.   Pecuniary damages according to Alabama Wrongful Death Statute;

7.   An award of attorneys fees, pre-judgment and post-judgment interest and costs and disbursements of suit as provided by law; and

8.   Such other legal and equitable relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

The Decedent demands a trial by jury on all issues so triable in this civil action.


Signed this 21st day of April, 2007.


/s/ Jere L. Beasley
JERE L. BEASLEY (BEA020)
ANDY BIRCHFIELD, JR. (BIR006)
NAVAN WARD, JR. (WAR062)
GERALD B. TAYLOR, JR. (TAY026)

OF COUNSEL:

BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
Post Office Box 4160
Montgomery, Alabama 36103-4160
(334) 269-2343 telephone
(334) 954-7555 facsimile

40

# Exhibit 4



## JURY AWARDS IN AEMLD CASES

| | |
|---|---|
| $950,000 | <u>Castleberry v. Cantrell Mach. Co.</u>, 2004 WL 3201190 (Ala. Cir. Ct., Blount County, Sept. 2, 2004) (product liability action by a woman whose hand was injured by a chicken heart and liver harvesting machine) |
| $50,000,000 (Original Verdict) | <u>Mack Trucks, Inc. v. Witherspoon</u>, 867 So. 2d 307 (Ala. 2003) (products liability case arising out of a tractor-trailer rollover) |
| $12,000,000 ($6,000,000 Compensatory, $6,000,000 Punitive) | <u>Marran v. PruTech Industries</u>, 2003 WL 23111870 (Ala. Cir. Ct., Lamar County, Aug. 29, 2003) (wrongful death case based on products liability claim against truck manufacturer arising out of rollover and absence of cab guard on logging truck) |
| $7,000,000 | <u>Dasial v. Snap Products</u>, 2003 WL 23111815 (Ala. Cir. Ct., Baldwin County, May 28, 2003) (wrongful death case based on products liability claim against manufacturer of tire repair product after treated tire exploded) |
| $4,168,500 ($1,068,500 Compensatory, $3,100,000 Punitive) | <u>McClain, et al. v. Metabolife Intl., Inc.</u>, 259 F. Supp. 2d 1225 (N.D. Ala. 2002) (products liability action by four plaintiffs who suffered cardiac symptoms after using ephedra-based diet drug) (reversed on appeal, 401 F.3d 1233 (11th Cir. 2005), and remanded for a new trial) |
| $960,000 ($25,000 over and above $935,000 in pre trade settlement) | <u>Hannah v. Gregg Bland & Berry</u>, 2002 WL 32169253 (Ala. Cir. Ct., Colbert County, Oct. 25, 2002) (wrongful death case arising out of fatal crush injury in industrial belt equipment) |
| $122,800,000 ($22,800,000 Compensatory, $100,000,000 Punitive) | <u>Jernigan v. General Motors Corp.</u>, Bullock County (May 3, 2002) (products liability case arising out of collapse of Oldsmobile passenger compartment) (reversed on appeal, 883 So.2d 646 (Ala. 2003), and remanded for new trial) |
| $510,000 (Compensatory) $18,000,000 (Punitive) | <u>Hobart Corporation v. Scottie W. Scoggins</u>, 776 So.2d 56 (Ala. 2000) (product liability action by a man who was injured while using a meat saw manufactured by Hobart) |
| $3,000,000 ($2,500,000 Compensatory $500,000 Punitive) | <u>Cessna Aircraft Company v. Robert Trzcinski</u>, 682 So. 2d 17 (Ala. 1996) (products liability action by a man who was injured in an airplane crash due to a defective shoulder harness) |
| $1,000,000 (Original verdict $825,000) | <u>Uniroyal Goodrich Tire Company v. Jackie Darryl Hall</u>, 681 So. 2d 126 (Ala. 1996) (products liability action by a man who was injured when wheel rim exploded) |
| $1,225,000 | <u>Ford Motor Company v. Jane Burdeshaw</u>, 661 So. 2d 236 (Ala. 1995) (wrongful death case brought against truck manufacturer after decedent was killed by a truck's transmission slipping out of neutral and crushing him) |

| | |
|---|---|
| $13,000,000 | General Motors Corporation v. Pamela L. Saint, 646 So. 2d 564 (Ala. 1994) (products liability action by a woman who was injured due to a defective seat belt) |
| $250,000 ($100,000 Compensatory, $150,000 Punitive) | Flagstar Enterprises, Inc. v. Maureen Davis, 709 So. 2d 1132 (Ala. 1998) (products liability action by a woman who found human blood in styrofoam package containing biscuit gravy) |
| $250,000 | Caterpillar, Inc. v. Hightower, 605 So. 2d 1193 (Ala. 1992) (product liability action brought by a man who was injured by a broken tree trunk while handling machinery during logging operation) |
| $115,000 | Banner Welders, Inc. v. Knighton, 425 So. 2d 441 (Ala. 1982) (product liability claim against manufacturer for personal injuries received on plastic welder) |
| $6,500,000 | Sears, Roebuck & Co. v. Harris, 630 So. 2d 1018 (Ala. 1993) (wrongful death case based on product liability claims against manufacturer and retailer of gas water heater that caused carbon monoxide poisoning) |
| $7,500,000 | General Motors Corp. v. Johnson, 592 So. 2d 1054 (Ala. 1992) (wrongful death case based on product liability claim where child was killed in automobile accident) |
| $5,000,000 | Industrial Chem. & Fiberglass Corp. v. Chandler, 547 So. 2d 812 (Ala. 1989) (widows of two workers killed in industrial accident brought wrongful death action against distributor of cleaning substance that ignited and caused death of workers) |
| $2,300,000 | General Motors Corp. v. Edwards, 428 So. 2d 1176 (Ala. 1985) (wrongful death case based on products liability claim where two boys were killed in automobile accident) |
| $200,000 | Interstate Engineering, Inc. v. Burnett, 474 So. 2d 624 (Ala. 1985) (wrongful death case brought against manufacturer of heat detectors after decedent was killed in a fire) |
| $300,000 | Piper Aircraft Corp. v. Byrne, 424 So. 2d 586 (Ala. 1982) (damages in wrongful death case based on product liability claims against airplane manufacturer where decedent was killed in plane crash) |
| $500,000 | Caterpillar Tractor Co. v. Ford, 406 So. 2d 854 (Ala. 1981) (wrongful death case based on product liability claims where decedent was killed in an accident on a tractor manufactured by defendant) |

Exhibit 5

[FILED]

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

DEC 21, 2001

CLERK
U. S. DISTRICT COURT
MIDDLE DIST. OF ALA.

DAVID KESTER, et al.,          )
                               )
        Plaintiffs,            )
                               )
v.                             )          CIVIL ACTION 01-D-1381-N
                               )
BAYER CORPORATION, et al.,     )
                               )
        Defendants.            )

## MEMORANDUM OPINION AND ORDER

Before the court is Plaintiffs' Motion To Remand, which was
filed on November 9, 2001.  Defendant Bayer Corporation ("Bayer")
filed an Opposition to said Motion on November 26, the argument
of which was adopted in full by Defendant GlaxoSmithKline ("GSK")
on the following day.  Plaintiffs never responded to the
arguments asserted in said Opposition.  After careful
consideration of the arguments of counsel, the relevant law, and
the record as a whole, the court finds that Plaintiffs' Motion To
Remand is due to be denied.


## I. REMAND STANDARD AND FRAUDULENT JOINDER

It is well-settled that a defendant, as the party removing
an action to federal court, has the burden to establish federal
jurisdiction.  See Diaz v. Sheppard, 85 F.3d 1502, 1505 (11th
Cir. 1996).  A federal district court may exercise jurisdiction
over cases involving citizens of different states where the

EOD ___12/21/01___

27

amount in controversy, exclusive of interest and costs, exceeds $75,000. See 28 U.S.C. § 1332(a). "Diversity jurisdiction under 28 U.S.C. § 1332 requires complete diversity-every plaintiff must be diverse from every defendant." Tapscott v. MS Dealer Serv. Corp., 77 F.3d 1353, 1359 (11th Cir. 1996), abrogated on other grounds by Cohen v. Office Depot, Inc., 204 F.3d 1069 (11th Cir. 2000). However, as the Supreme Court has long recognized, diversity jurisdiction "cannot be defeated by a fraudulent joinder of a residential defendant having no real connection to the controversy." Wilson v. Republic Iron & Steel Co., 257 U.S. 92, 97 (1921).

Defendants bear a "heavy" burden in proving that the joinder of one of their own is fraudulent. Crowe v. Coleman, 113 F.3d 1536, 1538 (11th Cir. 1997). In examining whether a joinder is fraudulent, the court "should resolve all questions of fact and controlling law in favor of the plaintiff." Cabalceta v. Standard Fruit Co., 883 F.2d 1553, 1561 (11th Cir. 1989). "The plaintiff need not have a winning case against the allegedly fraudulent defendant; he [or she] need only have a possibility of stating a valid cause of action in order for the joinder to be legitimate." Triggs v. John Crump Toyota, Inc., 154 F.3d 1284, 1287 (11th Cir. 1998) (emphasis in original).

2

## II. FACTUAL AND PROCEDURAL BACKGROUND

The present cause of action is one of several hundred products liability suits pending nationwide against Defendants Bayer and GSK concerning the alleged health problems associated with the prescription drug Baycol. Though the cause of action was originally brought in the Circuit Court of Montgomery, Alabama, Bayer and GSK removed the matter to the present forum pursuant to 28 U.S.C. § 1446 on the basis of diverse citizenship. In so doing, they had to allege that two of the original Defendants-CVS, Inc. ("CVS"), and Yancey Park Drug Company, Inc. ("Yancey Park")-were fraudulently joined solely because their Alabama citizenship would defeat complete diversity of the parties.

The Complaint alleges that CVS and Yancey Park are pharmacies that played a sufficiently significant role in Baycol's movement through the stream of commerce so as to subject them to liability under Alabama tort law. However, both Defendants' Removal and their Opposition brief, the latter of which was supported with affidavits, raise the suspicion as to whether said Defendants ever played any role in the sale of Baycol. Indeed, the president of CVS has sworn that his company is not a licensed pharmacy, but rather owns two grocery stores, neither of which sells pharmaceuticals. (Opp. Ex. B.) Moreover,

3

Yancey Park Drug Company, Inc., the named defendant, has not filled any prescriptions since 1989, prior to Baycol's having entered the market. (Opp. Ex. B.) Curiously, Plaintiffs' Motion to Remand does not address these damning allegations, but merely restates the language of the Complaint as to the Alabama Defendants' liability. It is to be noted, however, that the served pharmacy Defendant Yancey Park Drug, a division of Foster Drugs of Alabama, Inc., has sold Baycol on occasion, allegedly to at least one of the present patients. (Id.) Nonetheless, its sole responsibility in that regard has never extended beyond merely filling subscriptions in accordance with doctors' instructions. (Id.)

## III. DISCUSSION

The first issue to address is the contention that the named pharmacy Defendants never sold Baycol. If true, the present discussion needs proceed no further. As noted above, nowhere do Plaintiffs counter Defendants' assertions that CVS—at least the CVS named and served as a Party in this action—is simply not engaged in any business of a pharmaceutical nature. An affidavit of the served Defendant states as much, so the court is compelled to conclude that Plaintiffs have erred in their efforts to find a culpable pharmacy in this regard. In short, CVS was fraudulently

4

joined.

This oversight may well be academic though, for even though Yancey Park was mistakenly served under the nomme de guerre Yancey Park Drug Company, Inc., Yancey Park itself has acknowledged that it is a pharmacy. Rule 15 permits a liberal pleading standard, and the court is unfamiliar with any precedent which permits the dismissal of a defendant simply because it was misnamed, particularly when said misnaming pertained only to the addition of "Company, Inc." Cf. Bryant Elec. Co. v. Joe Rainero Tile Co., 84 F.R.D. 120, 122 (W.D. Va. 1979) (observing that a "plaintiff may correct a misnomer in the complaint when it is clear that the person before the court is the person plaintiff intended to sue") (internal quotations omitted). The court deems it immaterial that the faulty nominative happened to coincide with that of a business no longer in existence; for purposes of Rule 15 that fact should matter no less than had Yancey simply been spelled without the letter "e". What is relevant for present purposes is that Yancey Park acknowledges having filled Baycol prescriptions and it does not deny having filled them for plaintiffs. At the very least, more discussion is needed to determine whether the joinder of Yancey Park was fraudulent.

Plaintiffs assert the Alabama Extended Manufacturer Liability Doctrine ("AEMLD") could possibly extend to

pharmacists, to the extent that "a manufacturer, supplier or seller who markets a product not reasonably safe when applied to its intended use in the usual and customary manner, is negligent as a matter of law." Entrekin v. Atlantic Richfield Co., 519 So.2d 447, 449 (Ala. 1987). In so doing, however, Plaintiffs do not cite a single instance in which an Alabama pharmacist has been found liable under this doctrine for merely filling a prescription as written by a doctor. Certainly it is Defendants' burden to prove the existence of jurisdiction, Pacheco de Perez v. AT&T Co., 139 F.3d 1368, 1373 (11th Cir. 1998), but Plaintiffs' silence follows extensive citation in Defendants' Removal to cases in Alabama and nationwide that simply refuse to extend tort liability to pharmacists and/or pharmacies who do no more than dispense prescription drugs.[1]

---

[1] The Alabama cases cited by Defendants that have refused to extend tort liability as such are numerous. Sanks v. Parke-Davis, No. 00-S-1122-M, slip op. at 7-10 (N.D. Ala. Nov. 2, 2000); Lansdell v. Am. Home Prods., No. 99-S-2110-NE (N.D. Ala. Oct. 26, 1999); Harrell v. Wyeth-Ayerst Lab. Co., No. 98-1194-BH-M (S.D. Ala. Feb. 1, 1999); Orr v. Wyeth-Ayerst Lab. Co., No. 98-3000-DIET (Mobile Cty. Cir. Ct. Aug. 2, 1999). This general rule has been recognized in countless other jurisdictions as well. Winn v. Jack Eckerd Corp., 3 F.3d 137 (5th Cir. 1993) (applying Texas law); Walker v. Jack Eckerd Corp., 434 S.E.2d 63 (Ga. App. 1993); Nichols v. Cent. Merch., Inc., 817 P.2d 1131 (Kan. App. 1991); McKee v. Am. Home Prods. Corp., 782 P.2d 1045 (Wash. 1989); Adkins v. Mong, 425 N.W.2d 151 (Mich. App. 1988) (per curiam). It is to be noted that these cases provided by Defendants in turn rely upon other jurisdictions, all of which follow the same rule regarding pharmacists and pharmacies.

6

Nor do Plaintiffs provide the court with any reason to believe that liability should extend to pharmacies beyond the bald assertion that the AEMLD imputes liability to every link in the chain of commerce, leaving the jury to consider the respective responsibility of each party. This contention contradicts established policy of Alabama tort law that when intricately complex products whose dangers are immediately indiscernible, the appropriate duties should be borne by the "learned intermediary." See Stone v. Smith, Kline & French Lab., 447 So.2d 1301, 1305 (Ala. 1984). The manufacturer has a duty to pass on the information regarding potential harms to doctors who then assist the patients in making informed decisions-by the time Plaintiffs arrived at Yancey Park there was no available information they might have uncovered that would have caused hesitation. Just as courts should not hold liable the shipping companies that transport the drugs from the factory to the wholesaler, liability should not extend to a business whose purpose is to effectuate the informed decision made by an ailing person. Absent an allegation that Yancey Park, whatever its true name might be, did other than what was expected of it by all parties in the chain of events, the court must conclude that there is no possibility that Plaintiffs can state a cause of action against it. Therefore, it is not a proper party to the

7

present action. Accordingly, complete diversity of citizenship exists as is required under 28 U.S.C. § 1332. Triggs, 154 F.3d at 1287.[3]

Complete diversity notwithstanding, Plaintiffs also argue that jurisdiction is inappropriate since Defendants have not proven by a "legal certainty" that the statutory requirement of $75,000 has been satisfied. Plaintiffs cite the wrong legal standard. Insofar as the Complaint made an unspecified demand for damages, Defendants need only establish by a preponderance of the evidence that the amount in controversy requirement has been met. Tapscott, 77 F.3d at 1357. Plaintiffs allege they suffered "significant muscle problems" (Compl. ¶¶ 3-4) due to Defendants' "conscious disregard of the foreseeable harm caused by" Baycol. (Id. at 17.) It is not uncommon in these circumstances for Alabama juries to award compensatory damages in excess of the jurisdictional prerequisite, even before punitive damages are considered. See, e.g., Toole v. McClintock, 999 F.2d 1430 (11th Cir. 1993) (addressing propriety of $400,000 compensatory award

_____

[3] Obviously, the general rule that all defendants must join in a petition for removal is inapplicable to those defendants that are fraudulently joined. Erkins v. Am. Bankers Ins. Co., 866 F. Supp. 1373, 1375 (N.D. Ala. 1994) ("[I]t is not necessary that a fraudulently or improperly joined defendant join with the other defendants in a petition for removal.") (internal quotations omitted). Accordingly, the fact that the pharmacist Defendants were improper parties to the action cures any alleged defect to the removal.

and $5,000,000 punitive award in medical products liability case). The court is persuaded that Defendants have met their burden in demonstrating that the amount in controversy "more likely than not" exceeds $75,000. Tapscott, 77 F.3d at 1357. Accordingly, jurisdiction is appropriate in the present matter.

### IV. ORDER

Based on the foregoing, it is CONSIDERED and ORDERED that Plaintiffs' Motion to Remand be and the same is hereby DENIED.

DONE this 21ˢᵗ of December, 2001.

UNITED STATES DISTRICT JUDGE

9

# Exhibit 6

Westlaw.

154 F.3d 1284
154 F.3d 1284, 12 Fla. L. Weekly Fed. C 83
**(Cite as: 154 F.3d 1284)**

▷

**Briefs and Other Related Documents**

United States Court of Appeals,
Eleventh Circuit.
David L. TRIGGS, Plaintiff-Appellant,
v.
JOHN CRUMP TOYOTA, INC.; World Omni
Financial Corporation, a.k.a. World Omni
Financial Corporation, Defendants-Appellees.
No. 97-6584.

Sept. 16, 1998.

Alabama resident who leased auto through Florida lessor brought class action against lessor and Alabama auto dealership, alleging that dealership and other dealerships sold cars in Alabama to lessor at inflated prices pursuant to scheme whereby lessor then leased cars to plaintiff class and passed excess cost on to them. Defendants removed action to federal court on grounds of diversity jurisdiction, and lessee moved to remand. The United States District Court for the Northern District of Alabama, No. CV-96-B-1723-J, Sharon Lovelace Blackburn, J., denied motion Lessee appealed. The Court of Appeals, Anderson, Circuit Judge, held that no basis existed for finding that dealership was fraudulently joined in order to defeat diversity jurisdiction, even though 98% of plaintiff class would not have claim against dealership.

Reversed and remanded.

West Headnotes

**[1] Federal Courts** ☞776
170Bk776 Most Cited Cases
Subject matter jurisdiction is a question of law subject to de novo review.

**[2] Federal Courts** ☞286.1
170Bk286.1 Most Cited Cases
Diversity jurisdiction requires complete diversity; every plaintiff must be diverse from every defendant. 28 U.S.C.A. § 1332.

**[3] Removal of Cases** ☞36
334k36 Most Cited Cases

An action may be removable if the joinder of the non-diverse party were fraudulent. 28 U.S.C.A. § 1441(a).

**[4] Federal Courts** ☞303
170Bk303 Most Cited Cases
Fraudulent joinder is a judicially created doctrine that provides an exception to the requirement of complete diversity. 28 U.S.C.A. § 1441(a).

**[5] Federal Courts** ☞303
170Bk303 Most Cited Cases
There are three instances in which a joinder of a non-diverse party is fraudulent, and does thus not defeat diversity jurisdiction: (1) where there is no possibility that the plaintiff can prove a cause of action against the resident (non-diverse) defendant; (2) where there is outright fraud in the plaintiff's pleading of jurisdictional facts; and (3) where a diverse defendant is joined with a nondiverse defendant as to whom there is no joint, several, or alternative liability and where the claim against the diverse defendant has no real connection to the claim against the nondiverse defendant. 28 U.S.C.A. § 1441(a).

**[6] Removal of Cases** ☞36
334k36 Most Cited Cases
If there is even a possibility that a state court would find that the complaint states a cause of action against any one of the resident defendants, the federal court must find that the joinder was proper and remand the case to the state court. 28 U.S.C.A. § 1441(a).

**[7] Federal Courts** ☞303
170Bk303 Most Cited Cases
For the joinder of a non-diverse defendant to be legitimate, and to thus defeat diversity jurisdiction, the plaintiff need not have a winning case against the allegedly fraudulent defendant; he need only have a possibility of stating a valid cause of action. 28 U.S.C.A. § 1441(a).

**[8] Removal of Cases** ☞107(7)
334k107(7) Most Cited Cases
In evaluating a motion to remand, the removing party bears the burden of demonstrating federal jurisdiction.

**[9] Federal Courts** ☞303
170Bk303 Most Cited Cases
Alabama resident who leased auto from defendant

154 F.3d 1284
154 F.3d 1284, 12 Fla. L. Weekly Fed. C 83
**(Cite as: 154 F.3d 1284)**

Florida lessor stated potential cause of action against defendant Alabama auto dealership in state court class action by alleging that dealership sold cars in Alabama to lessor at inflated prices pursuant to scheme whereby lessor then leased cars to plaintiff class and passed excess cost on to them, and thus, there was no basis for finding that dealership was fraudulently joined to defeat diversity jurisdiction, even though 98% of plaintiff class would not have claim against it; joinder of dealership fit within rule for permissive joinder of parties, and court was to consider citizenship only of named parties when determining whether diversity existed. 28 U.S.C.A. § § 1332, 1441(a).

**[10] Federal Courts** ☞288
170Bk288 Most Cited Cases
In class actions, a court should consider only the citizenship of the named parties to determine whether there is diversity jurisdiction. 28 U.S.C.A. § § 1332, 1441(a).

**[11] Federal Courts** ☞288
170Bk288 Most Cited Cases
In determining whether diversity jurisdiction existed in class action in which named plaintiff and one defendant were both Alabama residents, court would not look beyond named plaintiff's citizenship and bifurcate plaintiff class solely on basis of whether members of class had potential claim against all defendants. 28 U.S.C.A. § § 1332, 1441(a).

**[12] Federal Courts** ☞303
170Bk303 Most Cited Cases
Named plaintiff's alleged "bad faith" in joining non-diverse defendant did not warrant finding that such defendant was fraudulently joined in order to defeat diversity jurisdiction; defendants made no showing that plaintiff lacked real intention to get joint judgment against non-diverse defendant. 28 U.S.C.A. § § 1332, 1441(a).

**[13] Removal of Cases** ☞107(9)
334k107(9) Most Cited Cases
Plaintiff timely perfected interlocutory appeal to Court of Appeals from trial court order denying motion to remand to state court, even though plaintiff failed to file petition for appeal with Court of Appeals within ten days of district court's initial order certifying case for interlocutory appeal; district court reconsidered and re-entered its order, and plaintiff subsequently perfected his appeal in timely manner.
    *1286 Garve Ivey, Jr., Jasper, AL, Barry A. Ragsdale, King, Ivey & Warren, Birmingham, AL,

for Plaintiff-Appellant.

Jarred O. Taylor, II, Lee E. Bains, Jr., John A. Truitt, Maynard, Cooper & Gale, P.C., William A. Mudd, Hall, Conerly, Mudd & Bolvig, Birmingham, AL, for Defendants-Appellees.

Adam Sloane, Mayer, Brown & Platt, Evan Tager, Washington, DC, Amicus for ACOLI.

Brian Anderson, Washington, DC, amicus for PLAC.

Pamela Moore, Mobile, AL, amicus for IAODC and LFCJ.

Appeal from the United States District Court for the Northern District of Alabama.

Before ANDERSON and BIRCH, Circuit Judges, and PAINE [FN*], Senior District Judge.

FN* Honorable James C. Paine, Senior U.S. District Judge for the Southern District of Florida, sitting by designation.

ANDERSON, Circuit Judge:

This appeal presents an interesting question relating to diversity of citizenship jurisdiction and fraudulent joinder in the context of a class action. Adopting a novel approach, the district court found fraudulent joinder and diversity of citizenship. The district court retained jurisdiction. We reverse.

I. Facts and Procedural History
Plaintiff-appellant Triggs is an Alabama resident. He filed a class action fraud suit in Alabama state court against World Omni Financial Corp ("Omni"), a Florida corporation, and John Crump Toyota ("Crump"), an Alabama corporation. Plaintiff alleges that Crump and other dealerships sold cars in Alabama to Omni at inflated prices pursuant to a scheme whereby Omni then leased the cars to the plaintiff class and passed the excess cost on to them. Plaintiff alleges that Omni and Crump and the other dealers implemented this fraudulent scheme through misrepresentations and suppressions of material fact. The named plaintiff, Triggs, dealt with Omni through Crump.

Defendants-appellees filed a Notice of Removal, alleging diversity jurisdiction. The case was removed to the Northern District of Alabama. Plaintiff filed a Motion to Remand. The district

154 F.3d 1284
154 F.3d 1284, 12 Fla. L. Weekly Fed. C 83
(Cite as: 154 F.3d 1284)

Page 3

court found that the putative class which Triggs seeks to represent includes over 17,000 people, all of whom had dealt with Omni, but that only 371(2%) of them had dealt through Crump. The court held that Crump had been fraudulently joined. Because there was complete diversity between Triggs and Omni, the only remaining parties if Crump is disregarded, the motion to remand was denied. The district court then asserted supplemental jurisdiction over the 371 plaintiffs who had dealt with Omni through Crump.

The district court entered its order finding that Crump had been fraudulently joined and denying the motion for remand, and later certified the order for immediate appeal pursuant to 28 U.S.C. § 1292(b). This court granted the petition for permission to appeal.

### II. Issue
The issue presented by this appeal is: has defendant Crump been fraudulently joined merely because 98% of the members of the putative plaintiff class would have no claim against Crump, notwithstanding the fact that the named plaintiff has a potential claim to *1287 impose joint and several liability on defendants Crump and Omni?

### III. Standard of Review
[1] Subject matter jurisdiction is a question of law subject to de novo review. Tapscott v. MS Dealer Service Corp., 77 F.3d 1353, 1356 (11th Cir.1996).

### IV. Discussion
[2] A civil case filed in state court may be removed by the defendant to federal court if the case could have been brought originally in federal court. 28 U.S.C. § 1441(a). [FN1] Federal courts have diversity jurisdiction over all civil actions where the amount in controversy exceeds $50,000 [FN2] and the action is between the citizens of different states. 28 U.S.C. § 1332. [FN3] Diversity jurisdiction requires complete diversity; every plaintiff must be diverse from every defendant. Tapscott v. MS Dealer Service Corp., 77 F.3d 1353, 1355 (11th Cir.1996).

FN1. "[A]ny civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a).

FN2. As of January 17, 1997, the

jurisdictional amount increased to $75,000. See Federal Courts Improvement Act of 1996, P.L. No. 104-317, § 205, 110 Stat. 3847, 3850 (codified as amended at 28 U.S.C. § 1332). Because the present action was filed prior to this effective date, the amount in controversy requirement for this case is $50,000.

FN3. "(a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between--
(1) citizens of different States."
28 U.S.C. § 1332.

The named plaintiff, Triggs, is a citizen of Alabama. Defendant Omni is a citizen of Florida. Defendant Crump is a citizen of Alabama. Accordingly, on the face of the pleadings, there is a lack of complete diversity which would preclude removal of the case to federal court.

[3][4][5][6][7][8][9] However, an action may nevertheless be removable if the joinder of the non-diverse party, defendant Crump, were fraudulent. Tapscott, 77 F.3d at 1359. [FN4] Fraudulent joinder is a judicially created doctrine that provides an exception to the requirement of complete diversity. Joinder has been deemed fraudulent in two situations. The first is when there is no possibility that the plaintiff can prove a cause of action against the resident (non-diverse) defendant. Coker v. Amoco Oil Co., 709 F.2d 1433, 1440 (11th Cir.1983), superceded by statute on other grounds as stated in Georgetown Manor, Inc. v. Ethan Allen, Inc., 991 F.2d 1533 (11th Cir.1993). The second is when there is outright fraud in the plaintiff's pleading of jurisdictional facts. Coker, 709 F.2d at 1440. In Tapscott, 77 F.3d at 1355 (11th Cir.1996), a third situation of fraudulent joinder was identified--i.e., where a diverse defendant is joined with a nondiverse defendant as to whom there is no joint, several or alternative liability and where the claim against the diverse defendant has no real connection to the claim against the nondiverse defendant. Id. at 1360. In the instant case, the parties do not suggest that there has been "outright fraud in the plaintiff's pleading of jurisdictional facts," so we concern ourselves only with the first and third types of fraudulent joinder. Turning to the first type, "If there is even a possibility that a state court would find that the complaint states a cause of action against any one of the resident defendants, the federal court must find that the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

154 F.3d 1284
154 F.3d 1284, 12 Fla. L. Weekly Fed. C 83
**(Cite as: 154 F.3d 1284)**

Page 4

joinder was proper and remand the case to the state court." *Coker,* 709 F.2d at 1440-41 (emphasis added). The plaintiff need not have a winning case against the allegedly fraudulent defendant; he need only have a *possibility* of stating a valid cause of action in order for the joinder to be legitimate. In the instant case, Triggs has asserted facts which clearly state a potential cause of action against Crump in state court. He has alleged that Crump and Omni, working in concert, defrauded him by misrepresenting and suppressing material facts with regard to automobile lease transactions. Therefore, Triggs's complaint states a potential cause of action against Crump in state court. With *1288 regard to Triggs, Crump is not fraudulently joined.

> FN4. In evaluating a motion to remand, the removing party bears the burden of demonstrating federal jurisdiction. *Pacheco de Perez v. AT & T Co.,* 139 F.3d 1368, 1373 (11th Cir.1998).

Indeed, the joinder of Crump fits comfortably within the rule for permissive joinder of parties as provided in Rule 20 of the Federal Rules of Civil Procedure. With respect to the joinder of defendants, Rule 20 provides:

> All persons ... may be joined in one action as defendants if there is asserted against them jointly, severally, or in the alternative, any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action.

Fed.R.Civ.P. 20. In this case, the named plaintiff (and incidentally 2% of the putative class in addition) is asserting a claim for relief against Omni and Crump jointly and severally arising out of the same transaction, and giving rise to common questions of law and fact. Of course, in this case, the joinder of the members of the putative plaintiff class is pursuant to Rule 23 of the Federal Rules of Civil Procedure. We note also, however, that the permissive joinder standards of Rule 20 are satisfied. With respect to joinder of plaintiffs, Rule 20 provides:

> All persons may join in one action as plaintiffs if they assert any right to relief jointly, severally, or in the alternative in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all these persons will arise in the action.

Fed.R.Civ.P. 20. In the instant case, the members of the putative plaintiff class assert such rights against Omni, Crump and the other unnamed dealers arising out of the series of automobile lease transactions allegedly orchestrated by Omni, which give rise to common questions of law and fact. Of particular importance for this case, Rule 20 specifically provides that "[a] plaintiff or defendant need not be interested in obtaining or defending against all the relief demanded. Judgment may be given for one or more of the plaintiffs according to their respective rights to relief, and against one or more defendants according to their respective liabilities." Fed.R.Civ.P. 20. In other words, the fact that a great many of the members of the putative plaintiff class can seek no relief against one of the defendants, Crump, would be no obstacle to the permissive joinder of Crump under Rule 20. Accordingly, we readily conclude that the joinder of defendant Crump satisfies the standards of Rule 20.

[10] The contention of defendants in this case focuses upon the claims of the members of the putative plaintiff class, rather than upon the named plaintiff. Defendants argue that Crump must be deemed to have been fraudulently joined merely because 98% of the members of the putative plaintiff class would have no claim against Crump. This focus is inconsistent with the well-settled rule for class actions that a court should consider only the citizenship of the named parties to determine whether there is diversity jurisdiction. *Supreme Tribe of Ben-Hur v. Cauble,* 255 U.S. 356, 41 S.Ct. 338, 65 L.Ed. 673 (1921). *Accord Snyder v. Harris,* 394 U.S. 332, 89 S.Ct. 1053, 1059, 22 L.Ed.2d 319 (1969) (dictum) ("Under current doctrine, if one member of a class is of diverse citizenship from the class' opponent, and no nondiverse members are named parties, the suit may be brought in federal court even though all other members of the class are citizens of the same State as the defendant and have nothing to fear from trying the lawsuit in the courts of their own State," citing *Ben-Hur* ); *In re School Asbestos Litigation,* 921 F.2d 1310, 1317 (3d Cir.1990); *In re Agent Orange Prod. Liability Litigation,* 818 F.2d 145, 162 (2d Cir.1987); *Kerney v. Fort Griffin Fandangle Ass'n, Inc.,* 624 F.2d 717, 720 (5th Cir.1980) ("Given that the amended complaint properly brought a class suit, it alleged citizenship sufficient to establish diversity by alleging that the named defendants were citizens of Texas, for a class is considered to be diverse from the opposing party if the named parties are diverse," citing *Ben-Hur* ); [FN5] 7A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane § 1755 p. 63-64 ("Rule 23 would be completely unworkable in the diversity *1289 context and its value significantly compromised if the citizenship of all the class members, many of whom may be unknown, had to be

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

154 F.3d 1284
154 F.3d 1284, 12 Fla. L. Weekly Fed. C 83
**(Cite as: 154 F.3d 1284)**

considered in establishing jurisdiction."). Pursuant to this well-settled rule, we look to the citizenship of the named plaintiff, Triggs, and conclude that there is not complete diversity, because, although Triggs is diverse with respect to defendant Omni, he is not diverse with respect to the properly-joined defendant, Crump. [FN6]

> FN5. In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. *Id.* at 1209.

> FN6. Amicus calls our attention to *Zahn v. International Paper Co.*, 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973). There, the Court held in the context of a class action that the amount in controversy for purposes of the then $10,000 requirement of 28 U.S.C. § 1332(a) could not be satisfied by aggregating the value of the claims of the members of the plaintiff class. Although the named plaintiff did meet the $10,000 jurisdictional requirement, the Court held that any member of the putative class not meeting the jurisdictional amount would have to be dismissed. In so holding, the Court relied on its long-standing precedent interpreting the statutory phrase "matter in controversy," and the fact that "Congress, with complete understanding of how the courts had construed the statute, had not changed the governing language." *Id.* at 298-300, 94 S.Ct. at 511. Unlike the *Zahn* case, which addressed the issue involving the interpretation of the statutory phrase "matter in controversy," the instant case presents the different issue of the interpretation of the statutory language relating to diversity of citizenship and the meaning of the concept of complete diversity. The precedent controlling the issue before us, also precedent of long-standing stature, provides that courts should consider only the citizenship of the named parties in determining whether or not there is complete diversity. In evaluating the complete diversity issue in this case, we thus conclude that *Zahn* in inapposite. *See Snyder v. Harris*, 394 U.S. 332, 89 S.Ct. 1053, 1059, 22 L.Ed.2d 319 (1969) (recognizing this distinction between the analysis of diversity of citizenship and the

analysis for the amount in controversy).

[11] Contrary to the well-settled rule that the citizenship of the named parties is controlling, defendants invite this court to look beyond the named plaintiff and bifurcate the plaintiff class solely on the basis of whether or not the members of the class have a potential claim against all defendants. Finding no persuasive precedent for this position, we reject defendants' invitation. There is precedent for bifurcating a class or severing claims where the claims are separable and have no logical connection. In *Tapscott v. M.S. Dealer Service Corp.*, 77 F.3d 1353 (11th Cir.1996), this court addressed a fraudulent joinder issue in the context of a removed class action. The case as filed in state court involved what the *Tapscott* opinion referred to as two classes. The first class consisted of named plaintiffs, citizens of Alabama, who had claims against certain defendants, also citizens of Alabama, arising out of the sale of service contracts on automobiles sold and financed in Alabama. The second class consisted of different named plaintiffs, citizens of Alabama, who had claims against a different defendant, Lowe's, a North Carolina citizen, arising out of the sale of extended service contracts in connection with the sale of retail products. The court referred to the two classes as the automobile class and the merchant class. Lowe's sought to remove the case to federal court, arguing that the claims against it should be severed from the claims against the defendants in the automobile class. The district court agreed and severed the two classes. The court remanded to state court the claims involving the automobile class as to which there was no diversity, but retained the claims against the merchant class, with respect to which there was complete diversity. This court affirmed. We concluded that there was a fraudulent misjoinder because Lowe's was improperly joined with the non-diverse defendants in the automobile class (there being no allegation of joint liability), because there was "no real connection" between the two controversies, *id.* at 1360, and because the misjoinder was "so egregious as to constitute fraudulent joinder." *Id.*

*Tapscott* is readily distinguishable from the case at bar. Unlike *Tapscott*, the instant case does not involve two distinct classes that have "no real connection" to each other. To the contrary, there is only one class in the instant case and one named plaintiff, Triggs. Triggs and all the members of the putative class have claims for relief which would impose joint liability upon Omni and the particular dealership involved. Among the dealerships

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

154 F.3d 1284
154 F.3d 1284, 12 Fla. L. Weekly Fed. C 83
**(Cite as: 154 F.3d 1284)**

involved was the named defendant, Crump, the dealership through whom the named plaintiff, Triggs, dealt with Omni. Focusing on the only named plaintiff there is clearly no reason to bifurcate the class. Even if we should, as defendants suggest, compare the claims of Triggs and those *1290 members of the putative class who dealt with Omni through the Crump dealership, to the claims of other members of the putative class who dealt with Omni through other automobile dealerships, we would find that those other claims arise out of a series of transactions precisely like the Triggs-Omni transaction and give rise to common questions of law and fact. Thus, unlike *Tapscott*, there is a real connection between the claims of the named plaintiff and the claims which defendants seek to bifurcate and sever (i.e., the claims of the 98% of the putative class). Unlike the situation in *Tapscott*, the parties in the instant case have been properly joined, in full compliance with the standards set out in Rule 20. We conclude that *Tapscott* provides no support for defendants' desire to bifurcate the instant plaintiff class.

Nor do we find other persuasive support for bifurcating the instant plaintiff class. It is true that a few district courts in Alabama, in unpublished opinions, have accepted such an invitation to bifurcate a plaintiff class merely because many members of the putative class do not have claims against one of the named defendants. *See, e.g., Arnold v. Ford Motor Co.*, Civ. Action No. CV-95-PT-0073-M (N.D.Ala. May 2, 1995) (unpublished decision). Arnold, an Alabama citizen purporting to represent a class of purchasers of Ford pickup trucks in Alabama, sued a diverse defendant, Ford Motor Company, and a nondiverse defendant, Pollack Ford Company. Pollack apparently was one of the numerous Ford dealerships through whom the Alabama class dealt with Ford. Although the facts of the case are not entirely clear from the opinion, we will assume *arguendo* that the relevant facts are virtually indistinguishable from the instant facts. The court concluded that the joinder of Pollack was fraudulent merely because most members of the putative class dealt with Ford through dealerships other than Pollack, and thus had no claim against Pollack. Disregarding Pollack, the court concluded there was complete diversity. We find this precedent unpersuasive for several reasons. Defendants' reliance upon *Tapscott* to support this precedent is without merit for the reasons noted above. [FN7] Also, there is nothing to support this precedent in the standards for permissive joinder as provided in Rule 20. To the contrary, the express language of Rule 20

indicates that all plaintiffs need not seek relief against all defendants. Finally, *Arnold* and its progeny are inconsistent with the well established rule that, in a class action context, courts should look to named parties in evaluating the complete diversity requirement. For the foregoing reasons, we reject defendants' invitation to bifurcate the instant plaintiff class.

> FN7. A number of well-reasoned district court decisions have also rejected the result of *Arnold* and its progeny. *See, e.g., Atchison v. Woodmen of the World Ins. Society*, 982 F.Supp. 835 (S.D.Ala.1997).

[12] Finally, defendants contend that plaintiff's "bad faith" is enough to warrant a finding that Crump was fraudulently joined. Defendants assert that plaintiff joined defendant Crump solely for the purpose of defeating diversity jurisdiction, and they argue that this constitutes a fraudulent joinder. Defendants apparently infer this "bad faith" purpose from the fact that plaintiff joined as a named defendant only one of the numerous automobile dealerships through whom the members of the putative class dealt with Omni. Defendants apparently suggest that if the plaintiff class really wanted to pursue a judgment against the dealerships, as well as against Omni, they would have joined more than just one dealership. [FN8] We reject defendants' *1291 argument; it is inconsistent with binding precedent. Supreme Court precedent is clear that a plaintiff's motivation for joining a defendant is not important as long as the plaintiff has the intent to pursue a judgment against the defendant. In *Chicago, Rock Island & Pacific Ry. Co. v. Schwyhart*, 227 U.S. 184, 33 S.Ct. 250, 57 L.Ed. 473 (1913), the plaintiff filed an action for personal injuries against the railway company and its servant, Barrett, whose immediate negligence allegedly caused the injury. Plaintiff and defendant Barrett were citizens of Missouri, but the railway company was diverse. The railway company sought to remove the case to federal court, arguing, *inter alia*, that Barrett was joined for the sole and fraudulent purpose of preventing a removal, being a person of little or no property while the company was fully able to pay. Rejecting that argument, the Court held: "[o]n the question of removal, we have not to consider more than whether there was a real intention to get a joint judgment, and whether there was a colorable ground for it ... as the record stood when the removal was denied." *Id.* at 194, 33 S.Ct. at 251. The Court also said:

> FN8. We note that the district court did not

154 F.3d 1284
154 F.3d 1284, 12 Fla. L. Weekly Fed. C 83
**(Cite as: 154 F.3d 1284)**

suggest that the joinder of Crump was fraudulent because of plaintiff's "bad faith." To the contrary, the district court acknowledged that "[i]f the court considers only the named plaintiff, then Crump was not fraudulently joined." District Court Order at 7. Defendants' "bad faith" argument is inconsistent with precedent, *see infra,* and the argument also lacks logical force as a factual matter. There are other potential reasons that plaintiff might not have joined the other dealerships. At this early stage in the proceedings, it is not surprising that the dealership uppermost in plaintiff's mind was the dealer through whom the named plaintiff dealt with Omni. Plaintiff may need discovery in order to obtain pertinent information about other dealerships. Moreover, most of the other dealerships are probably also citizens of Alabama, since the plaintiff class is composed of persons who leased automobiles in Alabama. Defendants apparently fault plaintiff for not joining more of the potential Alabama defendants, an action that hardly suggests a fraudulent intent to avoid diversity jurisdiction.

Again, the motive of the plaintiff, taken by itself, does not affect the right to remove. If there is a joint liability, he has an absolute right to enforce it, whatever the reason that makes him wish to assert the right.... Hence, the fact that the company is rich and Barrett poor does not affect the case. *Id.* at 193, 33 S.Ct. at 251. *Accord Chicago, Rock Island & Pacific Ry. Co. v. Whiteaker,* 239 U.S. 421, 36 S.Ct. 152, 60 L.Ed. 360 (1915) ("to apply the epithet 'fraudulent' to the joinder will not suffice: the showing must be such as compels the conclusion that the joinder is without right"); *Parks v. New York Times Co.,* 308 F.2d 474 (5th Cir.1962). In the instant case, nothing suggests an absence of a "real intention to get a joint judgment" against defendant Crump. Pursuant to the foregoing precedent, we reject defendants' "bad faith" argument.

[13] For the foregoing reasons, we hold that Crump is not fraudulently joined. Because there is not complete diversity among the parties, the federal courts do not have subject matter jurisdiction to hear this case. [FN9]

FN9. Defendants make additional arguments which we readily find to be without merit. First, defendants argue that the instant case

involves a defect in removal procedure and that therefore the motion to remand was untimely under 28 U.S.C. § 1447(c). We reject this argument. It is clear that plaintiff's motion to remand was based on the assertion that the district court was without subject matter jurisdiction, an assertion with which we agree for the reasons spelled out in the text. Because there is no time limit for motions to remand that challenge subject matter jurisdiction, plaintiff's motion was timely filed.

Defendants also argue that plaintiff did not perfect his interlocutory appeal to this Court. Plaintiff failed to file a petition for appeal with the Eleventh Circuit within ten days of the district court's initial order certifying this case for interlocutory appeal. However, the district court reconsidered and re-entered its order, a procedure which was recognized in *Aparicio v. Swan Lake,* 643 F.2d 1109, 1112 (5th Cir., Apr.27, 1981). Plaintiff subsequently perfected his appeal in a timely manner. Consequently, we reject defendants' procedural arguments.

V. Conclusion

We reverse the district court's judgment and remand with directions that the district court remand this case to the Alabama state court.

REVERSED AND REMANDED.

154 F.3d 1284, 12 Fla. L. Weekly Fed. C 83

**Briefs and Other Related Documents** (Back to top)

• 97-6584 (Docket) (Jul. 22, 1997)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

113 F.3d 1536
113 F.3d 1536, 27 Envtl. L. Rep. 21,555, 10 Fla. L. Weekly Fed. C 976
**(Cite as: 113 F.3d 1536)**

Briefs and Other Related Documents

United States Court of Appeals,
Eleventh Circuit.
Arthur L. CROWE, Jr., Edith Crowe Ingram, Eleanor
Ingram Kiefling, Plaintiffs-
Appellants,
v.
Daniel COLEMAN, Crown Central Petroleum
Corporation, Crown Stations, Inc.,
Defendants-Appellees.
**No. 96-8116.**

May 21, 1997.

Landowners sued present and former adjacent landowner, in state court, seeking recovery for damages caused by leakage on to their property of gasoline entering ground while former owner was operating gasoline station on premises. Case was removed and landowners sought remand. The United States District Court for the Northern District of Georgia, No. 1:95-CV-2669-CAM, Charles A. Moye, J., denied motion and entered summary judgment for present owner. Appeal was taken. The Court of Appeals, Edmondson, Circuit Judge, held that: (1) there was arguable cause of action against present owner for nuisance, under Georgia law, even though original pollution was caused by actions of prior owner and present owner had not contributed to pollution; (2) as result present owner was not joined to suit for purposes of defeating diversity jurisdiction and his presence in action required remand; and (3) isolated remark by suing landowners' counsel during appeal, that it could not be proved that gasoline flowed on to suing landowners' property during present owner's tenure, was too ambiguous to determine issue in present owner's favor.

Summary judgment vacated; reversed and remanded with instructions.

Roney, Senior Circuit Judge, dissented and filed opinion.

West Headnotes

[1] Removal of Cases ⚖️36
334k36 Most Cited Cases

[1] Removal of Cases ⚖️102
334k102 Most Cited Cases
If there is even a possibility that state court would

find complaint states cause of action against any resident defendant, federal court must find that joinder of same citizenship defendant was proper and remand case to state court for lack of diversity of citizenship.

[2] Nuisance ⚖️48
279k48 Most Cited Cases
Landowners adequately pleaded that current adjacent landowner was liable for nuisance in connection with seepage of gasoline from his property to landowner's, under Georgia law, even though complaint spoke in terms of "trespass" and it was acknowledged that landowners had no trespass claim; while "trespass" can mean specific form of tort action, it also means wrongful entry upon land of another, encroachment or intrusion, and as broadly interpreted could support nuisance claim.

[3] Federal Civil Procedure ⚖️654.1
170Ak654.1 Most Cited Cases
When multiple defendants are named in complaint, allegations can be and usually are to be read in such a way that each defendant is having allegation made about him individually.

[4] Removal of Cases ⚖️36
334k36 Most Cited Cases

[4] Removal of Cases ⚖️101.1
334k101.1 Most Cited Cases
Joinder to state court nuisance suit, of present owner of property from which gasoline originally entering ground during prior owner's use of land as gasoline station was alleged to be leaking on to complaining landowners' property, was not merely for purpose of defeating diversity, and citizenship of present landowner required remand to state court; complaint stated arguable nuisance cause of action against present landowner under Georgia law, as there was case holding that owner could have liability for continuing damage to property even though not responsible for original damage, and although there was also contrary precedent this was irrelevant for remand determination purposes.

[5] Removal of Cases ⚖️36
334k36 Most Cited Cases

[5] Removal of Cases ⚖️107(7)
334k107(7) Most Cited Cases
For plaintiff to present arguable claim against in-state defendant and, therefore, to require case removed to federal court to be remanded to state court, plaintiff

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

113 F.3d 1536
113 F.3d 1536, 27 Envtl. L. Rep. 21,555, 10 Fla. L. Weekly Fed. C 976
(Cite as: 113 F.3d 1536)

Page 2

need not show that he could survive in district court a motion for summary judgment filed by that in-state defendant; for remand, after drawing all reasonable inferences from record in plaintiff's favor and then resolving all contested issues of fact in favor of plaintiff, there need only be reasonable basis for predicting that state law might impose liability on facts involved.

**[6] Federal Courts** ☞773.1
170Bk773.1 Most Cited Cases
Waivers and concessions made in appellate oral arguments need to be unambiguous before they are allowed to change outcome of appeal from reversal to affirmance.
*1537 Roy E. Barnes, Marietta, GA, for Plaintiffs-Appellants.

Stephen E. O'Day, Mary Maclean Doolan, Smith, Gambrell & Russell, Atlanta, GA, for Defendants-Appellees.

Appeal from the United States District Court for the Northern District of Georgia.

Before EDMONDSON and BLACK, Circuit Judges, and RONEY, Senior Circuit Judge.

EDMONDSON, Circuit Judge:

Plaintiffs-Appellants appeal from the district court's denial of their motion for remand to the Superior Court of Cobb County, Georgia and from the grant of summary judgment for Defendant Daniel Coleman. Because the district court erred in concluding that Plaintiffs could maintain no possible cause of action against Georgia-resident Defendant Coleman, we reverse the district court's denial of Plaintiff's motion for remand. Because the case must be returned to state court, we vacate the award of summary judgment.

## I. Background

Plaintiffs are Arthur Crowe, Jr., Edith Crowe and Eleanor Ingram Kiefling. Together they own a parcel of land in Georgia. Plaintiffs filed suit in the Superior Court of Cobb County against Defendants Crown Stations, Inc. ("Crown"), a subsidiary of Crown Central Petroleum Corporation, and Daniel Coleman. Jurisdiction in state court was based on Coleman, who is a Georgia resident. See O.C.G.A. § 9-10-30. In their complaint, Plaintiffs alleged that Coleman, as the current owner of the land adjoining Plaintiffs' property, and Crown, as the former owner, were liable for damages caused to Plaintiffs by the

escape of gasoline from Defendants' property onto Plaintiffs' property. Defendant Coleman was served with a copy of the complaint on September 29, 1995.

On October 20, Defendants filed a notice of removal of the case to the District Court for the Northern District of Georgia; Defendants alleged that Georgia-resident Defendant Coleman had been fraudulently joined to defeat diversity jurisdiction. On November 13, Defendant Coleman submitted a motion for summary judgment, claiming that he did not cause Plaintiffs' harm. In support of this motion, Coleman submitted his own affidavit and the affidavit of a Crown engineer. *1538 These affidavits said that, although Crown formerly operated a service station on the land adjacent to Plaintiffs' property and stored petroleum in underground storage tanks (USTs), those USTs were removed from the ground before Coleman became the owner of the property. Coleman swore in his affidavit that, during his ownership, he "never caused the release of any petroleum products at the S. Atlanta Rd. property [that is, his own land]."

Also on November 13, Plaintiffs moved for remand to state court, arguing that they stated a valid claim for continuing nuisance against Coleman under Georgia law. Defendants responded by contending that Plaintiffs' complaint only alleged a cause of action for trespass and, if a nuisance had been alleged, that Plaintiffs could succeed on no nuisance claim against Coleman. On November 30, Plaintiffs moved to amend their complaint to state expressly a cause of action for nuisance. On January 11, 1996, the district court issued an order (1) denying Plaintiffs' motion to remand to state court, concluding there was no possibility Plaintiffs could establish a cause of action against Coleman; (2) denying Plaintiffs' motion to amend the complaint as futile; and (3) granting Defendant Coleman's motion for summary judgment.

## II. Discussion
### A. The Law of Remand

In a removal case alleging fraudulent joinder, the removing party has the burden of proving that either: (1) there is no possibility the plaintiff can establish a cause of action against the resident defendant; or (2) the plaintiff has fraudulently pled jurisdictional facts to bring the resident defendant into state court. Cabalceta v. Standard Fruit Co., 883 F.2d 1553, 1561 (11th Cir.1989). The burden of the removing party is a "heavy one." B, Inc. v. Miller Brewing Co., 663 F.2d 545, 549 (5th Cir. Unit A 1981).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

113 F.3d 1536
113 F.3d 1536, 27 Envtl. L. Rep. 21,555, 10 Fla. L. Weekly Fed. C 976
(Cite as: 113 F.3d 1536)

To determine whether the case should be remanded, the district court must evaluate the factual allegations in the light most favorable to the plaintiff and must resolve any uncertainties about state substantive law in favor of the plaintiff. *Id.* at 549. The federal court makes these determinations based on the plaintiff's pleadings at the time of removal; but the court may consider affidavits and deposition transcripts submitted by the parties. *Id.*

[1] While "the proceeding appropriate for resolving a claim of fraudulent joinder is similar to that used for ruling on a motion for summary judgment under Fed.R.Civ.P. 56(b)," *id.* at n. 9, the jurisdictional inquiry "must not subsume substantive determination." *Id.* at 550. Over and over again, we stress that "the trial court must be certain of its jurisdiction before embarking upon a safari in search of a judgment on the merits." *Id.* at 548- 49. When considering a motion for remand, federal courts are not to weigh the merits of a plaintiff's claim beyond determining whether it is an arguable one under state law. *See Id.* "If there is even a possibility that a state court would find that the complaint states a cause of action against any one of the resident defendants, the federal court must find that joinder was proper and remand the case to state court." *Coker v. Amoco Oil Co., 709 F.2d 1433, 1440-41 (11th Cir.1983), superseded by statute on other grounds as stated in Georgetown Manor, Inc. v. Ethan Allen, Inc., 991 F.2d 1533 (11th Cir.1993).*

This consequence makes sense given the law that "absent fraudulent joinder, plaintiff has the right to select the forum, to elect whether to sue joint tortfeasors and to prosecute his own suit in his own way to a final determination." *Parks v. The New York Times Co., 308 F.2d 474, 478 (5th Cir.1962).* The strict construction of removal statutes also prevents "exposing the plaintiff to the possibility that he will win a final judgment in federal court, only to have it determined that the court lacked jurisdiction on removal," *see Cowart Iron Works, Inc. v. Phillips Constr. Co., Inc., 507 F.Supp. 740, 744 (S.D.Ga.1981)* (quoting 14A C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3721), a result that is costly not just for the plaintiff, but for all the parties and for society when the case must be relitigated.

***1539** B. The Parties' Arguments*

Plaintiffs argue that removal of this case was improper and that remand is required, because Plaintiffs have stated a valid nuisance claim against

Defendant Coleman. [FN1] Defendants make two arguments challenging Plaintiffs' nuisance claim. First, Defendants argue that Plaintiffs' complaint at the time of removal only stated a claim for trespass and did not expressly state a claim for nuisance. Second, Defendants argue that, even if Plaintiffs' complaint otherwise stated a cause of action for nuisance, no possibility exists that Plaintiffs can establish a nuisance claim against Coleman under Georgia law.

> FN1. Although Plaintiffs' complaint alleged a trespass claim against all Defendants, including Coleman, Plaintiffs acknowledge that they have no trespass claim against Coleman under Georgia law because Coleman did not cause the petroleum to be released onto his property. So, Plaintiffs' argument for remand relies solely on the nuisance claim.

*1. Adequacy of Plaintiffs' Pleading for Nuisance Claim*

[2][3] Plaintiffs' complaint in this case was a verified one, that is, under oath in respect to the facts. The complaint says, among other things:

8.

The defendants have allowed the escape of gasoline from their property onto the property of the plaintiffs.

9.

The actions of the defendants in allowing gasoline to escape from their property and to travel onto the property of the plaintiffs is a trespass for which damages may be awarded and which should be permanently enjoined.

. . . .

12.

The plaintiffs have made demands upon the defendants to remove from the property of the defendants the gasoline that they have allowed to trespass and contaminate the plaintiffs' property and which *continues to do so.* The defendants' failure to so remove the gasoline and accompanying contamination prevents the property of the plaintiffs from being salable. (emphasis added).

When multiple defendants are named in a complaint, the allegations can be and usually are to be read in such a way that each defendant is having the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

113 F.3d 1536
113 F.3d 1536, 27 Envtl. L. Rep. 21,555, 10 Fla. L. Weekly Fed. C 976
**(Cite as: 113 F.3d 1536)**

allegation made about him individually. We also note that, under the liberal requirements of notice pleading, "[n]o technical forms of pleading ... are required." *See* Fed.R.Civ.P. 8(a); O.C.G.A. § 9-11-8(a)(2)(A).

The word "trespass," although it can mean a specific form of tort action, can also mean "a wrongful entry upon the lands of another" or an "encroachment or intrusion." *The Random House Dictionary of the English Language* 2016 (2d ed. 1987). So, although Plaintiffs' unamended complaint--including paragraph 12-- might be capable of more than one meaning, the complaint can easily be read to be a sworn statement that Coleman has allowed gasoline from his land to intrude wrongfully (and to continue to intrude) on Plaintiffs' property and to contaminate Plaintiffs' land. Once more, a plaintiff seeking to have his case remanded to state court is to be given the benefit of every reasonable inference in his favor.

2. *Nuisance Claim Under Georgia Law*

[4] We now must decide whether the facts alleged in Plaintiffs' complaint state even an *arguable* cause of action under Georgia law. The answer is "yes."

Defendants contend that Georgia law creates no cause of action against a landowner for the failure to abate a continuing nuisance caused by his property where the landowner did not create the nuisance: again, no one claims that Coleman caused gasoline to spill onto his land. And, Georgia case law may be in conflict on this issue. But, at this point in the procedural history of the case--that is, on a motion for remand, our analysis (as well as the district court's) must be limited to determining whether Plaintiffs have even an arguable claim. So, any ambiguity or doubt about the substantive state law favors remand to state court.

*1540 Section 41-1-5(a) of the Georgia Code provides: "The alienee of a person owning property injured may maintain an action for continuance of the nuisance for which the alienee of the property causing the nuisance is responsible." The statute provides no guidance about whether an alienee, such as Coleman, may be held responsible for a nuisance where he engaged in no act-- in this case, the storage of petroleum--which initially caused the nuisance if he, after notice, refuses to abate the continuing nuisance: in this case, petroleum seeping from his land onto adjoining land. The parties point to no Georgia Supreme Court case that has decided the issue. [FN2]

FN2. In their brief, Defendants cite the Georgia Supreme Court case of *Cox v. Cambridge Square Towne Houses Inc.,* 239 Ga. 127, 236 S.E.2d 73 (1977), for the proposition that "a defendant must engage in some act or operation which continues a nuisance in order to be liable." In *Cox,* the plaintiff sued the owner of adjoining property; the defendant had installed the storm sewer that was the subject of the nuisance claim. *Cox* did not involve a suit against an alienee who owned property after the creation of the nuisance; so the court did not decide the issue.

Each party relies on a Georgia Court of Appeals case to support its argument. Defendants point to *Citizens & Southern Trust Co. v. Phillips Petroleum Co.,* 192 Ga.App. 499, 385 S.E.2d 426, 428 (1989), where the court rejected the plaintiffs' nuisance claim against the subsequent owner of adjoining property when that adjoining property was already contaminated and its subsequent owner did not contribute to the contamination. Plaintiffs point to *Hoffman v. Atlanta Gas Light Co.,* 206 Ga.App. 727, 426 S.E.2d 387, 391 (1992), where the court permitted a nuisance claim where the defendant did not cause the initial contamination of the defendant's land, but where the preexisting contamination of the defendant's land continued to migrate onto the plaintiffs' property.

On the face of these opinions, there appears to be a conflict on this issue in the Georgia appellate decisions. Defendants, and Judge Roney in his dissent, point to factors which might distinguish this case from *Hoffman.* [FN3] If this case were properly before the district court (and this court) under original diversity jurisdiction, we would be obligated to predict how the Georgia Supreme Court would rule on this issue or to certify the question to the Georgia Supreme Court. For purposes of determining whether this case should be remanded to state court, however, the inquiry by federal judges must not go so far:

FN3. We do not reject the proposed distinctions. We accept that they may possibly be appropriate; but, more important, we do not see them as doubtlessly correct either. For example, *Hoffman* never seems to reply completely on some contract concept to support the cause of action allowed in that case: a nuisance claim

113 F.3d 1536
113 F.3d 1536, 27 Envtl. L. Rep. 21,555, 10 Fla. L. Weekly Fed. C 976
(Cite as: 113 F.3d 1536)

against the property owner who created no contamination, but whose property was the source of the contamination of his neighbors'--the plaintiffs--land.

This is an *Erie* problem in part, but only part. In the usual diversity situation a Federal Court, no matter how difficult the task, must ascertain (and then apply) what the state law is.... But here the question is whether there is arguably a reasonable basis for predicting that the state law might impose liability on the facts involved. If that possibility exists, a good faith assertion of such an expectancy in a state court is not a sham, is not colorable and is not fraudulent in fact or in law. *Bobby Jones Garden Apartments v. Suleski*, 391 F.2d 172, 176-77 (5th Cir.1968) (citations omitted). In this case, the arguable confusion in Georgia law itself supports remanding this case to state court. See *Parks*, 308 F.2d at 477 (noting in fraudulent joinder case that, "doubtful issues of law due to absence of definite pronouncements by the state supreme court are to be tried in the court having original jurisdiction of the case and are not to be determined in a removal proceeding.").

In the present case, neither the words of Plaintiffs' verified complaint nor-- as we will discuss more--the remainder of the record before the district court forecloses the possibility that petroleum, which had already leaked onto Defendants' property from the removed tanks, has continued to seep onto Plaintiffs' property during Coleman's ownership of the former service station site. Unlike the complaint, Defendant Coleman's answer *1541 is not under oath; but he denies wrongdoing. His denial, of course, does nothing to undercut the fact that plaintiffs have set out an arguable nuisance claim against him; the answer, at most, shows a controversy that needs to be resolved.

### 3. *Defendants' Affidavits*

Defendants also submitted affidavits which say that--before Coleman's ownership of the former service station site--the USTs were removed from the ground, and no petroleum products have been since stored or sold at the property. In addition, Coleman specifically says in his affidavit: "I have never caused the release of any petroleum products *at* [Defendants'] property." (emphasis added).

Coleman submitted the affidavits in support of his motion for summary judgment before the district court ruled on Plaintiffs' motion for remand.

Although submitted in support of a motion for summary judgment, Defendants' affidavits were probably properly considered by the district court on the question of remand; and we too will take them into account in deciding the limited question of whether a possibility exists that Plaintiffs have stated a nuisance cause of action against Coleman. See *Cabalceta*, 883 F.2d at 1561.

Seemingly on the basis of Defendants' affidavits [FN4], the district court found and concluded it to be undisputed that: "Since at least May 14, 1991, there have been ... no petroleum releases *from* the site" (emphasis added). If "release," as used by the district court, means no seepage or leakage onto Plaintiffs' land, [FN5] we cannot see how that fact can be said to be undisputed from the paper record before the district court and us. Coleman's affidavit and Plaintiffs' sworn complaint seem to leave open--as completely disputed--whether gasoline from Coleman's land (after he became the landowner) has intruded, and continues to intrude, onto Plaintiffs' land. By the way, we note that Plaintiffs--before the district court ruled on the summary judgment motion--filed, pursuant to the district court's local rules, a "Statement of Material Facts to Which There Remains a Genuine Issue to Be Tried," which included this statement: "Gasoline continues to leak from the contaminated property owned by Coleman onto the property of the Plaintiffs."

FN4. Based on the docket entries, we suppose that a hearing at which the parties were allowed to argue was held on the motions in the district court. We know that, when motions are orally argued (even when the pertinent hearing is for argument only and not one for the presentation of evidence), important things sometimes happen which impact on the factual record--for example, the judge while interrogating the lawyers obtains stipulations, concessions, and so on. But in this case, no one has said the oral argument in district court amended the paper record. And the transcript of the hearing in the district court is not part of the appellate record. So, we believe we are looking at the same factual record that was before the district court.

FN5. The district court might have used "release" to mean no release of gasoline onto the Defendants' own land. This fact is undisputed. The district court may then have gone on to conclude that Georgia law

113 F.3d 1536
113 F.3d 1536, 27 Envtl. L. Rep. 21,555, 10 Fla. L. Weekly Fed. C 976
(Cite as: 113 F.3d 1536)

allows no cause of action against Coleman even if gasoline, which had been released into the soil at the service station site before Coleman owned it, had seeped onto Plaintiffs' land after Coleman bought the former service station site. This approach would be erroneous, because it would entail a decision about Georgia law when the state's precedents are not plainly consistent.

In the light of the ostensible dispute of fact appearing in the documents in the record--including those under oath--summary judgment for defendant Coleman was very possibly erroneous. But, as a reviewing court, we need not go so far as to say summary judgment was wrongfully entered. We can just say (and we do say with more certainty) that the motion for remand was improperly denied.

[5] In terms of this circuit's law, the main point for us is this one: For a Plaintiff to present an arguable claim against an in-state defendant and, therefore, to require a case removed to federal court to be remanded to state court, the plaintiff need not show that he could survive in the district court a motion for summary judgment filed by that in-state defendant. For a remand, the plaintiff's burden is much lighter than that: after drawing all reasonable inferences from the record in *1542 the plaintiff's favor and then resolving all contested issues of fact in favor of the plaintiff, there need only be "a reasonable basis for predicting that the state law *might* impose liability on the facts involved." *B., Inc.*, 663 F.2d at 550 (quoting *Bobby Jones Garden Apartments,* 391 F.2d at 177) (emphasis added). Because the procedures are similar while the substantive standards are very different, district courts must exercise extraordinary care to avoid jumbling up motions for remand and motions for summary judgment that come before them.

In the remand context, the district court's authority to look into the ultimate merit of the plaintiff's claims must be limited to checking for obviously fraudulent or frivolous claims. Although we have said that district courts may look beyond the face of the complaint, we emphasize that the district court is to stop short of adjudicating the merits of cases that do not appear readily to be frivolous or fraudulent. Applying these principals to this case, we conclude that the district court--given the record before it--should have remanded the case to state court and should have never addressed the motion for summary judgment.

4. *Oral Argument in the Appellate Court*

This case, however, presents one more question. In dissent, Judge Roney points out a statement made at oral argument in this court by Plaintiffs' counsel; Judge Roney concludes from the statement that Plaintiffs cannot in fact dispute that no gasoline has intruded onto Plaintiffs' land from Coleman's land since Coleman was the landowner. Therefore, we must answer this question: If the district court erred on the record before it, does this error become harmless given Plaintiffs' counsel's words to the appellate court?

The pertinent statement of Plaintiff-Appellants' counsel occurred during the rebuttal in the context of the following exchange:

Judge Roney: "Is [the district court judge] correct or incorrect when he says, 'The following facts are undisputed: There have been no petroleum releases from the site since May 14, 1991.' "

Counsel: "He is correct that there has been no-- that was the day the tanks were taken out. There could have been no new releases, but it is undisputed that the gasoline remains on ..."

Judge Roney: "I'm not talking about that. I'm talking about whether any gasoline flowed from the property Mr. Coleman owned after he owned it?" [FN6]

FN6. At this point, Judge Roney may be asking a question which is different from the one the district court addressed when the district court said, "[s]ince at least May 14, 1991 ... there have been no petroleum releases from the site." *See supra* note 5.

Counsel: "We could not prove one way or the other. So, I cannot technically say that the new flow since Coleman ran it is disputed."

[6] That concessions and admissions of counsel at oral argument in appellate courts can count against them is doubtlessly true. *See, e.g., Rozar v. Mullis,* 85 F.3d 556, 563 (11th Cir.1996); *United States v. Gerber,* 994 F.2d 1556, 1558 (11th Cir.1993). But waivers and concessions made in appellate oral arguments need not be unambiguous before they are allowed to change the outcome of an appeal from a reversal to an affirmance. *See Glick v. White Motor Co.,* 458 F.2d 1287, 1291 (3d Cir.1972) ("[T]o be binding, judicial admissions must be unequivocal.") In the context of the entire oral argument in this case and of Plaintiffs' briefs, we are unwilling to base the outcome of this case on a few words uttered in the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

113 F.3d 1536
113 F.3d 1536, 27 Envtl. L. Rep. 21,555, 10 Fla. L. Weekly Fed. C 976
(Cite as: 113 F.3d 1536)

Page 7

last minute of Plaintiffs' counsel's rebuttal.

For example, earlier in the same oral argument, the following exchange occurred between Judge Roney and Appellants' counsel:

Judge Roney: "Where is the evidence that there was any continued leaking after Coleman got the property?"
Counsel: "There is evidence. It is alleged in the complaint ..."
Judge Roney: "No. It is very diffuse."
Counsel: "Here is the confusion. There is not the leakage from the tanks. The tanks are gone. But, there is gasoline on the adjoining property that, number one, continues to leak onto the ..." [counsel was interrupted]

*1543 At another point in the oral argument, Appellants' counsel spoke these words:

Counsel: "[The defendants] did not claim or deny in the summary judgment that the gasoline continues to be there. Nobody denies that, because it is."
Judge Roney: "Continues to be where?"
Counsel: "In the ground."
Judge Roney: "On your client's property?"
Counsel: "On our client's property and on [the defendants'] property."

For other representations of plaintiff-appellants on the timing of the seepage of gasoline onto their land, see Appellant's Brief at page 13 (characterizing the continuing nuisance as "the exuding gasoline") and at page 15 ("the pollutants currently obtruding Plaintiffs' property represent the continuing nuisance"). See also Appellant's Reply Brief at page 6 ("The cause of action against Coleman stems, not from any involvement with the leaky USTs, but rather, from his passive acquiescence of the continuing exudation of contamination from *his property* after failing his statutory duty to abate it upon Appellants' request.") (emphasis in original).

Taken as a whole, we cannot say that Plaintiff-Appellants' counsel's statements about when gasoline has seeped onto his clients' land were so consistent, plain and favorable to Coleman as to make the district court's error, in the light of the record before it, harmless in reality. Again, if there is ambiguity about what Plaintiffs' counsel has said, Plaintiffs are entitled to the construction most favorable to remand.

### III. *Conclusion*

If removal is doubtful, we remand the case. Therefore, we send this case back to the district court

to remand it to state court. [FN7] In doing so, we express no view of the ultimate outcome on the merits. Georgia's state courts--which have the final word on Georgia law--will decide all that.

> FN7. Because we decide that the district court erred by denying Plaintiffs' motion for remand based on the unamended complaint, we do not address Plaintiffs' argument that the district court erred by refusing to allow Plaintiffs to amend their complaint.

SUMMARY JUDGMENT VACATED.

REVERSED AND REMANDED.

RONEY, Senior Circuit Judge, dissenting:

I respectfully would affirm for the reasons set forth in Judge Moye's Order.

The reversal is based on the fact that there is "petroleum seeping from his [Coleman's] land onto adjoining land" and that "the preexisting contamination of the defendant's land continued to migrate onto the plaintiffs' property." The majority opinion recites that "neither the words of Plaintiffs' complaint nor the remainder of the record foreclose the possibility that petroleum has continued to seep onto Plaintiffs' property during Coleman's ownership."

This is contrary to the record, the understanding of Judge Moye, and the admissions of counsel at oral argument. Judge Moye recited as undisputed that since May 1991, prior to Coleman's ownership: "There have been no petroleum releases from the site." The parties do not dispute this fact on appeal. When asked directly about the accuracy of this statement at oral argument, counsel for plaintiffs said: "We could not prove one way or the other. So I cannot technically say that the new flow since Coleman owned it is disputed." Therefore, the case presented to this Court is based on this undisputed critical paragraph in Judge Moye's opinion:

Since at least May 14, 1991, there have been no deliveries of petroleum products to the former service station, there have been no petroleum products sold from the site, there have been no petroleum products stored at the site, and there have been no petroleum releases from the site.

On these undisputed facts, Georgia law is clear. If Coleman did not own the property or the offending tanks that caused the contamination, he cannot be

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

113 F.3d 1536
113 F.3d 1536, 27 Envtl. L. Rep. 21,555, 10 Fla. L. Weekly Fed. C 976
**(Cite as: 113 F.3d 1536)**

held responsible for the fact that the contaminants remain on the plaintiffs' property. *Citizens & So. Trust v. Phillips Petro., 192 Ga.App. 499, 385 S.E.2d 426, 428 (1989)* ("That there was no reoccurrence of a leak from the underground storage tanks after [defendants] purchased the property and relined the tanks is undisputed.... ***1544** Accordingly, the trial court did not err in granting summary judgment in favor of the [defendants].").

To the extent that plaintiffs seek to read *Hoffman v. Atlanta Gas Light Co., 206 Ga.App. 727, 426 S.E.2d 387 (1992)*, to the contrary, they overlook the critical facts of that case. "Atlanta Gas Light now holds and controls the easement *and the pipeline* which are the physical source of the contamination.... We will not hold that the alienee of the easement *and pipeline* has no legal duty to abate a continuing nuisance, *particularly under the easement agreement in effect between Atlanta Gas Light and [the complaining landowners]." Id. 426 S.E.2d at 391.* (Emphasis added). In this case, Coleman never held, controlled or owned the tanks that caused the contamination, nor did he have any contractual relation with the complaining landowners.

Plaintiffs' argument is that they made a demand of Coleman to remove the contamination on their property and that his refusal to do so amounts to a continuing nuisance. There is no authority for the proposition that by demanding the removal of a nuisance by someone who has had nothing to do with the source or maintenance of it, or the things which caused it, can somehow create a cause of action against them for a "continuing" nuisance, which they have never had anything to do with in the first place.

Under the undisputed facts as presented to this Court on appeal, plaintiffs have no cause of action against Coleman, and the district court correctly so ruled.

I would affirm.

113 F.3d 1536, 27 Envtl. L. Rep. 21,555, 10 Fla. L. Weekly Fed. C 976

**Briefs and Other Related Documents (Back to top)**

• 1996 WL 33423464 (Appellate Brief) Reply Brief of Appellants (Jul. 30, 1996)Original Image of this Document (PDF)

• 1996 WL 33498860 (Appellate Brief) Reply Brief of Appellants (Jul. 30, 1996)Original Image of this Document (PDF)

• 1996 WL 33423465 (Appellate Brief) Brief of Appellees (Jul. 01, 1996)Original Image of this Document (PDF)

• 1996 WL 33498859 (Appellate Brief) Brief of Appellees (Jul. 01, 1996)Original Image of this Document (PDF)

• 1996 WL 33423463 (Appellate Brief) Brief of Appellants (Apr. 25, 1996)Original Image of this Document (PDF)

• 1996 WL 33498858 (Appellate Brief) Brief of Appellants (Apr. 22, 1996)Original Image of this Document (PDF)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit 5

# AFFIDAVIT OF GEORGE ALEXANDER FIELDS, IV

STATE OF ALABAMA        )
                                )

COUNTY OF BALDWIN     )

I, George Alexander Fields, IV, under penalty of perjury, state as follows:

1.     I am over the age of eighteen years and am otherwise competent to make this affidavit. This affidavit is based upon my personal knowledge.

2.     From 1998 until 2003, I was employed as a pharmaceutical sales representative (also known as a "detailer") for G.D. Searle LLC and Pharmacia Corporation (hereinafter collectively "Pharmacia").

3.     As a detailer, I visited physicians and healthcare providers' offices and provided them FDA-approved package inserts and other FDA-approved information about Pharmacia's products, which is referred to as "detailing." My job was to make the physician aware of certain of Pharmacia's products, so that he or she could consider whether to prescribe them for particular patients.

4.     I am not a physician or pharmacist. The information and material I use to detail Pharmacia's drugs was derived exclusively from education provided to me by Pharmacia. Pharmacia provided me with the FDA-approved package inserts and other FDA-approved information for the medications I detailed. I had no involvement in the development or preparation of package inserts for any drugs, and no control over content or other written warnings.

B GSM 749115 v1
29U2026-000071 6/R/2007

5.      As part of my job duties, I detailed Celebrex®.  However, I do not know whether I visited with or provided any information about Celebrex® to plaintiff's prescribing physician because plaintiff has not identified him or her.

6.      At no time did I have any involvement with the design, manufacture, development or testing of the prescription medication Celebrex®, nor did I have any involvement in the FDA- approved package insert for Celebrex®.

7.      At no time did I ever sell, offer to sell, or take orders for the sale of Celebrex® to health care providers, physicians or patients.

8.      I have never made any presentations to the general public concerning Celebrex®.

9.      I have never met or spoken with the Plaintiff, Michael Allen or decedent Nina Earline Ratliff.

_George Alexander Fields IV_
GEORGE ALEXANDER FIELDS, IV

Before me, the undersigned Notary Public, came George Alexander Fields, IV, who is known to me, and who first being duly sworn, deposed and stated that the averments of this affidavit are true and correct, and who executed this affidavit in my person and present with his hand and seal, on this the __11th__ day of ___June___, 2007.

_Crystal D Morgan_
Notary Public
My Commission Expires: __12/8/08__

(SEAL)

B CS:# 749115 v1
2902036-000071 6/8/2007

# Exhibit 6

# AFFIDAVIT OF SHAD CANNON FLEEMAN

STATE OF GEORGIA        )

                           )

COUNTY OF _Forsyth_       )

I, Shad Cannon Fleeman, under penalty of perjury, state as follows:

1.     I am over the age of eighteen years and am otherwise competent to make this affidavit. This affidavit is based upon my personal knowledge.

2.     I am currently employed as a pharmaceutical sales representative (also known as a "detailer") for Pfizer Inc. I have been employed by Pfizer and its predecessor companies (hereinafter collectively "Pfizer") as a detailer since May, 1999, except for the time period of December, 2004 until December 2005.

3.     As a detailer, I visit physicians and healthcare providers' offices and provide them FDA-approved package inserts and other FDA-approved information about Pfizer's products, which is referred to as "detailing." My job is to make the physician aware of certain of Pfizer's products, so that he or she can consider whether to prescribe them for particular patients.

4.     I am not a physician or pharmacist. The information and material I use to detail Pfizer's drugs is derived exclusively from education provided to me by Pfizer. Pfizer provides me with the FDA-approved package inserts and other FDA-approved information for the medications I detail. I have no involvement in

1

B GSH 749111 v1
2902026-000071 6/8/2007

the development or preparation of package inserts for any drugs, and no control over content or other written warnings.

5.    As part of my job duties, I have detailed Celebrex® in the past. However, I do not know whether I visited with or provided any information about Celebrex® to plaintiff's prescribing physician because plaintiff has not identified him or her.

6.    At no time did I have any involvement with the design, manufacture, development or testing of the prescription medication Celebrex®, nor did I have any involvement in the FDA-approved package insert for Celebrex®.

7.    At no time did I ever sell, offer to sell, or take orders for the sale of Celebrex® to health care providers, physicians or patients.

8.    I have never made any presentations to the general public concerning Celebrex®.

9.    I have never met or spoken with the Plaintiff, Michael Allen or decedent Nina Earline Ratliff.

SHAD CANNON FLEEMAN

B GSH 749111 v1
2902026-000071 6/11/2007

Before me, the undersigned Notary Public, came Shad Cannon Fleeman, who is known to me, and who first being duly sworn, deposed and stated that the averments of this affidavit are true and correct, and who executed this affidavit in my person and present with his hand and seal, on this the ___11th___ day of ___June___, 2007.

(SEAL)

Notary Public
My Commission Expires: 21 April 2008

Joyce Haulman Patton
NOTARY PUBLIC
Fulton County, GEORGIA

3

# Exhibit 7

## AFFIDAVIT OF BRIAN JAMES ROBINSON

STATE OF ALABAMA                )
                                )
COUNTY OF JEFFERSON             )

I, Brian James Robinson, under penalty of perjury, state as follows:

1.    I am over the age of eighteen years and am otherwise competent to make this affidavit. This affidavit is based upon my personal knowledge.

2.    From 1999 until December, 2006, I was employed as a pharmaceutical sales representative (also known as a "detailer") for Pfizer Inc. ("Pfizer") or its predecessor companies (hereinafter collectively "Pfizer").

3.    As a detailer, I visited physicians and healthcare providers' offices and provided them FDA-approved package inserts and other FDA-approved information about Pfizer's products, which is referred to as "detailing." My job was to make the physician aware of certain of Pfizer's products, so that he or she could consider whether to prescribe them for particular patients.

4.    I am not a physician or pharmacist. The information and material I used to detail Pfizer's drugs was derived exclusively from education provided to me by Pfizer. Pfizer provided me with the FDA-approved package inserts and other FDA-approved information for the medications I detailed. I had no involvement in the development or preparation of package inserts for any drugs, and no control over content or other written warnings.

5.     As part of my job duties, I detailed Celebrex®.  However, I do not know whether I visited with or provided any information about Celebrex® to plaintiff's prescribing physician because plaintiff has not identified him or her.

6.     At no time did I have any involvement with the design, manufacture, development or testing of the prescription medication Celebrex®, nor did I have any involvement in the FDA- approved package insert for Celebrex®.

7.     At no time did I ever sell, offer to sell, or take orders for the sale of Celebrex® to health care providers, physicians or patients.

8.     I have never made any presentations to the general public concerning Celebrex®.

9.     I have never met or spoken with the Plaintiff, Michael Allen or decedent Nina Earline Ratliff.

_____
BRIAN JAMES ROBINSON


Before me, the undersigned Notary Public, came Brian James Robinson, who is known to me, and who first being duly sworn, deposed and stated that the averments of this affidavit are true and correct, and who executed this affidavit in my person and present with his hand and seal, on this the __11__ day of __June_____, 2007.

_____
(SEAL)                    Notary Public
                          My Commission Expires: _May 13, 2009_

# Exhibit 8

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

MICHAEL A. ALLEN as the
Administrator of the Estate of NINA
EARLINE RATLIFF, deceased

Plaintiff,

v.                                    Case No.: 07-900125

PFIZER INC., et al; GEORGE A.
FIELDS, SHAD FLEEMAN, BRIAN
ROBINSON, ROBERT L. VANDELUNE,
COLBURN'S NORTH PHARMACY,
INC.

Defendants.

## AFFIDAVIT OF ROBERT L. VANDELUNE

STATE OF ALABAMA        )
                        )
COUNTY OF _Houston_     )

I, Robert Vandelune, under penalty of perjury, state as follows:

1.    I am over the age of twenty-one years and am otherwise competent to
make this affidavit. This affidavit is based upon my personal knowledge.

2.    I am currently employed as a pharmaceutical representative (also
known as a "detailer") for Pfizer Inc ("Pfizer"). I have been employed by Pfizer as
a detailer since 1985.

B GSH 749192 v2
2902026-000071 6/11/2007

3.      As a detailer, I visit physicians and healthcare providers' offices and provide them FDA-approved package inserts and other FDA-approved information about Pfizer's products, which is referred to as "detailing."  My job is to make the physician aware of certain of Pfizer's products, so that he or she can consider whether to prescribe them for particular patients.

4.      I am not a physician or pharmacist. I have no specialized medical or pharmacological education.  The information and material I use to detail Pfizer's drugs is derived exclusively from education provided to me by Pfizer.  Pfizer provides me with the FDA-approved package inserts and other FDA-approved information for the medications I detail.  I have no involvement in the development or preparation of package inserts for any drugs, and no control over content or other written warnings.

5.      As part of my job duties, I have detailed Celebrex® in the past. However, I do not know whether I visited with or provided any information about Celebrex® to plaintiff's prescribing physician because plaintiff has not identified him or her.

6.      At no time did I have any involvement with the design, manufacture, development or testing of the prescription medication Celebrex®, nor did I have any involvement in the FDA- approved package insert for Celebrex®.

2

7.    At no time did I ever sell, offer to sell, or take orders for the sale of

Celebrex® to health care providers, physicians or patients.

8.    I have never made any presentations to the general public concerning

Celebrex®.

9.    I have never met or spoken with the Plaintiff, Michael Allen, or

Plaintiff's decedent, Nina Earline Ratliff.

_____
ROBERT VANDELUNE


Before me, the undersigned Notary Public, came Robert Vandelune, who is
known to me, and who first being duly sworn, deposed and stated that the
averments of this affidavit are true and correct, and who executed this affidavit in
my person and present with his hand and seal, on this the _11th_ day of
_June_____, 2007.

_____
Notary Public
My Commission Expires: _9-15-2010_____

(SEAL)

3